Henry SPEIGNER, Petitioner-Appellee,

v.

Arnold R. JAGO, Superintendent,
Respondent-Appellant.

No. 78–3290.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 9, 1978.

Decided June 13, 1979.

Rehearing and Rehearing En Banc
Denied July 24, 1979.

William J. Brown, Atty. Gen. of Ohio, Simon B. Karas, Asst. Atty. Gen., Columbus, Ohio, for respondent-appellant.

Elliott R. Levine, Cleveland, Ohio (Court-appointed), for petitioner-appellee.

Before EDWARDS, Chief Judge, WEICK, Circuit Judge, and PECK, Senior Circuit Judge.

PECK, Senior Circuit Judge.

At a jury trial in the state court, petitioner Henry Speigner was convicted of second degree murder under O.R.C. § 2901.05.[1] After unsuccessfully exercising his rights to direct appeal, Speigner petitioned the district court for a writ of habeas corpus. The district judge, in granting the writ, concluded that petitioner's conviction was "totally devoid of evidentiary support."

The present case is a difficult one because of the small quantum of evidence presented to support petitioner's conviction of second degree murder. On the one hand, there is "some" evidence of record which tends to make petitioner's guilt as to the crime charged more likely than not.[2] On the other hand, and contrary to the conclusion of the state appellate court, the totality of the evidence against petitioner does not amount to evidence sufficient to support, as a matter of law, guilt beyond a reasonable doubt. Thus, the present case requires this Court to carefully delineate the extent to which a federal court is obligated to review, under Fourteenth Amendment due process, a state criminal conviction.

## EVIDENCE OF RECORD

A review of the trial transcript reveals that the victim, William Bell, was murdered either late in the night of June 25, 1973, or early in the morning of June 26, 1973. His body, which had been badly beaten, was found lying in a street in Cleveland, Ohio, at approximately 7:00 a. m., June 26. It was established at trial that Bell had died of two fatal gun shots, a .32 caliber pistol shot from the front and a shotgun blast from the back.

During trial the state presented evidence that a highway patrolman had stopped

---

1. Petitioner Henry Speigner was indicted by the Grand Jury of Cuyahoga County, Ohio, in April 1973, for the crime of murder in the first degree, in violation of former O.R.C. § 2901.01. Petitioner was convicted of the lesser included offense of murder in the second degree under O.R.C. § 2901.05.

 2901.05 (12403). Murder in second degree. No person shall purposely and maliciously kill another. Whoever violates this section, except in the manner described in sections 2901.01, 2901.02, 2901.03, and 2901.04 of the Revised Code, is guilty of murder in the second degree and shall be imprisoned for life.

2. Rule 401, Federal Rules of Evidence reads as follows:

 Definition of "Relevant Evidence."

 "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

Bell's automobile for a routine safety inspection at 5:02 a. m. on June 26, 1973, at a location approximately one hour's drive from the spot where the victim's body was found. When the vehicle was stopped, Speigner was a passenger in the automobile. He identified himself by use of an alias, Frank Mathews, and he presented the patrolman with a welfare card. In the course of the officer's questioning of the driver of the car, Roger Scott, Scott stated that he had rented the vehicle from the victim for $15. Speigner heard Scott's statement, and both men laughed at the fact that they had been "stuck" with an unsafe vehicle. Certain evidence presented at trial specifically refuted the rental story offered by the driver. First, testimony disclosed that Bell had used his car in his business and that he had followed a rule of never lending it to anyone, not even his brothers. Further, various checks and documents were found in a briefcase in the trunk of Bell's car, and these items were to be filed by the victim on the morning of June 26, 1973.

Speigner was released after a short detention by the highway patrol, but he stated he would return and post a $50 bond for the driver Scott. Without fulfilling this promise, Speigner left the Cleveland area within a few days. During the period of the next ten months, Speigner traveled to various cities across the country, including San Francisco, Las Vegas, St. Louis and New York City. When he was apprehended by New York police on April 10, 1974, Speigner stated that he was aware the Cleveland police had been looking for him and he admitted that he had been acquainted with both the victim Bell and Scott, the driver of the vehicle.

An inventory of the victim's car was conducted in the morning hours of June 26, 1973. This inventory revealed a shattered vent window on the driver's side of the vehicle, window glass on the front floor, blood stains of the victim's type (A) on the rear seat, a bloody fingerprint of an undetermined origin on the right front door, and a sawed-off shotgun under the seat which Speigner had been occupying. Subsequent scientific examination of the shotgun did not, in any way, connect the gun to petitioner and the gun was not test fired or otherwise proven to be the murder weapon.

## THE "NO EVIDENCE" STANDARD

■ In reviewing the district court's grant of a writ of habeas corpus, we are obligated to adhere to the prevailing standard of review in habeas corpus proceedings, the so-called "no evidence" standard, enunciated by the Supreme Court in *Thompson v. City of Louisville*, 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960). Therein, the Court concluded that a state violates a defendant's constitutional due process when it convicts the defendant of a crime without evidence to support an essential element of the crime. 362 U.S. at 204, 80 S.Ct. 624. *Cf. Vachon v. New Hampshire*, 414 U.S. 478, 480, 94 S.Ct. 664, 38 L.Ed.2d 666 (1974); *Harris v. United States*, 404 U.S. 1232, 1233, 92 S.Ct. 10, 30 L.Ed.2d 25 (1971).

> The ultimate question presented to us is whether the charges against petitioner were so totally devoid of evidentiary support as to render his conviction unconstitutional under the Due Process Clause of the Fourteenth Amendment. Decision of this question turns not on the sufficiency of the evidence, but on whether this conviction rests upon any evidence at all.
>
> \* \* \* \* \* \*
>
> Under the words of the [city] ordinance itself, if the evidence fails to prove all three elements of this loitering charge, the conviction is not supported by evidence, in which event it does not comport with due process of law.
>
> \* \* \* \* \* \*
>
> Just as "conviction upon a charge not made would be sheer denial of due process," so is it a violation of due process to convict and punish a man without evidence of his guilt.

*Thompson, supra*, 362 U.S. at 199, 204, 206, 80 S.Ct. at 625, 628, 629.

On a superficial level of analysis, the "no evidence" standard of *Thompson* appears to quickly dispose of the present appeal. As we previously stated, there is "some" evidence of record which tends to establish, to a degree, that petitioner is guilty of the crime of second degree murder. For example, the victim's automobile was stopped at 5:02 a. m., a few hours after his murder, a short distance from the place where his body was discovered. At that time, blood stains of the victim's type were in the car; a bloody but unidentified fingerprint was on the door; a sawed-off shotgun was under the passenger's seat; a vent window was shattered and glass was strewn on the floor. From this evidence, a jury could reasonably infer that the victim's car might have been at the scene of his murder. When we add to this inference the facts that petitioner was a passenger in the vehicle when it was stopped at 5:02 a. m., that he was seated directly over the shotgun, and that he later admitted knowing both the victim and the driver of the vehicle, we must conclude that the record in this case contains "some" evidence relevant to the elements of second degree murder.

On a deeper level of analysis, however, the "no evidence" standard of *Thompson* does not automatically bar petitioner's request for relief. In decisions subsequent to *Thompson*, the Supreme Court has interpreted the "no evidence" standard in a manner not consistent with the narrow, literal meaning of the words, "no evidence." In these decisions, the Court has given the *Thompson* standard a more flexible construction, one which takes into account the fact that in virtually every criminal prosecution there is "some" evidence of record to support a conviction.

Two cases, *Vachon v. New Hampshire,* supra, 414 U.S. 478, 94 S.Ct. 664, 38 L.Ed.2d 666 (1974), and *Johnson v. Florida,* 391 U.S. 596, 88 S.Ct. 1713, 20 L.Ed.2d 838 (1968) (per curiam), illustrate the current meaning of the *Thompson* standard. In *Johnson* a defendant had been found guilty of vagrancy under a Florida statute that made it unlawful to be found "wandering or strolling" from place to place without any lawful purpose or object. At trial, the state had established that the defendant had been seated on a park bench at 4:25 in the morning; that just prior to his arrest the defendant had told the officers that he was waiting for a bus; that the buses had stopped service some five and one-half hours prior to the defendant's arrest; and that, when questioned by the officers, the defendant offered no explanation of what he had been doing for the previous three hours. This evidence notwithstanding, the majority of the Court concluded " . . . that so far as the 'wandering or strolling' ingredient of the crime is concerned, the record is lacking in any evidence to support the judgment." 391 U.S. at 598, 88 S.Ct. at 1715. As to the single evidentiary fact that the defendant had been seated on a park bench, allegedly for some three hours, Mr. Justice White wrote in dissent, "Most inhabitants of park benches reach their bench by wandering or strolling." 391 U.S. at 599, 88 S.Ct. at 1715 (White, J., dissenting). In *Vachon v. New Hampshire, supra,* a case decided some six years after *Johnson,* the Supreme Court again adopted a flexible interpretation of the *Thompson* standard. In *Vachon* the operator of the Head Shop in Manchester, New Hampshire, had been convicted of contributing to the delinquency of a minor in violation of a state statute. The minor had purchased a button inscribed "Copulation Not Masturbation" at the Head Shop from an unidentified salesperson who may or may not have been the defendant. The majority of the Court, in vacating the state's judgment of conviction, concluded that the record was "completely lacking" in evidence on the element of wilfulness, an essential element of the charge. 414 U.S. at 479, 94 S.Ct. 664. The Court reached this conclusion despite the facts that the defendant, according to his own trial testimony, had controlled and operated the shop on the day of the sale in question; that the button sold to the minor had been prominently offered for sale on a velvet display card on a counter in the shop; and that the same type of button had been previously purchased at the shop during the time the

defendant was its operator. 414 U.S. at 486, 94 S.Ct. at 668 (Rehnquist, J., dissenting).

Decisions such as *Vachon* and *Johnson* implicitly recognize that a federal court's review of a state trial record must be, to a certain extent, a matter of degree. Recognition of this fact is essential if habeas corpus review of evidentiary matters is to fulfill any meaningful purpose. Although trial records at times contain only small amounts of circumstantial and highly speculative evidence, virtually every record contains "some" evidence, in an absolute sense, that tends to establish the guilt of the accused. Thus, if the Supreme Court were to exclude all notions of degree from habeas corpus review, the *Thompson* "no evidence" standard would be rendered an Iron Curtain type blockade in the path of every state prisoner who seeks federal court review of the evidence supporting his conviction.

 Even though the Supreme Court, in decisions such as *Vachon* and *Johnson*, has implicitly rejected a rigid interpretation of the "no evidence" standard, the absolute language of the *Thompson* decision continues to pose a fundamental dilemma. When a federal court denies a petitioner habeas corpus relief, the court can simply cite the language of the *Thompson* standard and refer to an "iota of evidence" found in the state trial record. *See, e. g., Brooks v. Rose,* 520 F.2d 775, 777 (6th Cir. 1975). However, when a federal court grants a petitioner habeas corpus relief, the court is frequently forced to ignore certain relevant evidence in order to make its decision consistent with the literal meaning of the words, "no evidence." In view of the continuing nature of this dilemma, we are convinced that it is time to forthrightly recognize that the "no evidence" standard of *Thompson,* as it prevails today, incorporates some notion of degree or weight of evidence.[3] Consistent with this recognition, I would disavow the literal interpretation of the "no evidence" standard adopted by this Circuit in *Brooks v. Rose, supra,* and would adopt the dissenting views of Judge McCree therein.[4] In *Brooks,* despite the existence of some speculative evidence that the defendant was sane at the time of the acts in question, the record was without evidentiary support within the context of the Fourteenth Amendment.[5] As Judge McCree wrote:

I respectfully dissent. The question presented by this appeal is whether a jury may arbitrarily disregard overwhelming and uncontradicted expert

3. For example, if to make a case, it is necessary to prove that a defendant was in a given Cincinnati motel room at a particular time in question, testimony that he was in the State of Ohio would clearly be "no evidence" as to the critical fact. Testimony placing him in the building, however, might present a close question; while evidence that the defendant had gotten off the elevator on the particular floor of the motel within the crucial time frame would properly support a jury's finding in the face of a constitutional challenge.

4. *But see* Judge Edwards' concurring opinion and Judge Weick's dissenting opinion, *infra.* The dissenting opinion herein states that "no panel of this Court has the power or right to overrule the decision of another panel." The opinion concludes that "[t]he overruling should be a function of an en banc court, and not that of a single panel, unless a subsequent Supreme Court decision overrules the decision on which the panel relied." However, there is no rule in this Circuit which requires an en banc hearing to overrule a decision of a three-judge panel. Further, such requirement has not been fol-

lowed in practice by this Court. *See, e. g., United States v. Bess,* 593 F.2d 749 (6th Cir. 1979); *Beasley v. United States,* 491 F.2d 687, 696 (6th Cir. 1974). Finally, the wisdom of such requirement is questionable. The existence of the machinery for an en banc hearing serves as a necessary and effective check on one panel's power to overrule another panel's decision. However, it would be a waste of judicial time and resources to automatically require an en banc hearing each and every time this Court overrules or modifies one of its previous decisions.

5. Although I would reverse the decision of *Brooks v. Rose,* 520 F.2d 775 (6th Cir. 1975), I do not suggest that expert testimony supporting a finding of insanity can be refuted only by expert testimony to the contrary. Rather, I conclude simply that in *Brooks* the particular testimony relied upon to establish the defendant's sanity was so overwhelmed by the opposing testimony of legal insanity that the result was "no evidence" for the purpose of Fourteenth Amendment due process.

opinion evidence that a defendant was insane when he committed the act for which he was tried, and find him sane beyond a reasonable doubt solely on the basis of eyewitness testimony of his behavior that afforded no direct evidence of his mental state and permitted only speculative inferences about it. I would hold that this conviction is without evidentiary support of a critical element of the offense charged and that it therefore offends the due process guarantee of the Fourteenth Amendment.

520 F.2d at 780 (McCree, J., dissenting).

■ Turning once again to the evidence of record in the present case, and in the light of our reasoning above, we conclude that the record before us lacks the required evidentiary support for petitioner's conviction of second degree murder. First, there is no evidence of record to indicate the length of time that petitioner was in the victim's car when it was stopped at 5:02 a. m. on June 26, 1973. Second, other than the fact that petitioner had been sitting directly over the shotgun found underneath a seat in the victim's car, there is no evidence that connects petitioner to the gun. In fact, the only piece of identifying evidence produced in regard to the gun is a blond hair and petitioner is black. Third, there is no evidence that the shotgun found in the victim's car was the shotgun used in the victim's murder. Finally, there is no evidence either to establish that petitioner had recently used a gun of any kind or that petitioner had recently been involved in a fight, when he was stopped on June 26, 1973. In summary, although there is evidence to constitutionally support a finding that petitioner committed some crime, for example possession of a stolen vehicle or obstruction of justice,[6] the record on appeal does not constitutionally support a finding that petitioner actually killed or participated in the killing of the victim, an essential element of second degree murder under O.R.C. § 2901.05.

## CONCLUSION

■ In *Thompson v. City of Louisville, supra,* the Supreme Court considered the extent to which the Due Process Clause of the Fourteenth Amendment requires a federal court to review the evidence supporting a state criminal conviction. In its decision in *Thompson,* the Court set forth what has come to be called the "no evidence" standard of review. As is apparent from the absolute language of the *Thompson* decision, the "no evidence" standard was designed to prevent any unwarranted intrusions by the federal courts into the process of state criminal trials. Although the standard has effectively furthered this purpose, a literal meaning of the standard virtually eliminates the very function served by habeas corpus review of evidentiary records.

■ Practically speaking, in every criminal prosecution, there is "some" evidence of record, in an absolute sense, that tends to establish the guilt of the accused as to the crime charged. As a result of this fact, when the *Thompson* "no evidence" standard is applied in a literal manner, the result invariably is the dismissal of the state prisoner's request for federal court relief. It is true that the Supreme Court has repeatedly adhered to the absolute language of the *Thompson* decision; yet in a number of decisions relying on *Thompson,* the Court has implicitly recognized the potentially restrictive impact of the "no evidence" language. In short, the Supreme Court, in decisions subsequent to *Thompson,* has given the "no evidence" standard a flexible construction; one which does not openly comprehend the principles of "sufficiency of evidence," but one which does not rigidly adhere to a "totally devoid of evidentiary support" standard. *See, e. g., Vachon v. New Hampshire, supra; Johnson v. Florida, supra.* We conclude that the substance of

---

**6.** In addition to the evidence previously considered in the text, the record below contains evidence that petitioner cooperated with the driver Scott in giving a false rental story and that petitioner evaded the Cleveland police for some ten months after his June 26, 1973, release. Although these facts may tend to prove that petitioner committed some crime, they do not tend to prove that petitioner committed the crime of second degree murder.

the "no evidence" standard, as it has been developed in decisions such as *Vachon* and *Johnson*, must prevail over the form of its language.

Recently the Supreme Court granted certiorari in the Fourth Circuit opinion of *Jackson v. Virginia*, 439 U.S. 1001, 99 S.Ct. 609, 58 L.Ed.2d 676, in part to review the "no evidence" standard in relation to the holding of *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). Mr. Justice Brennan, writing for the majority in *Winship*, strongly asserted the "constitutional stature" of the principle of "guilt beyond a reasonable doubt."

> Lest there remain any doubt about the constitutional stature of the reasonable-doubt standard, we explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.

397 U.S. at 364, 90 S.Ct. at 1073. Two years ago, Mr. Justice Stewart, in his persuasive dissent in *Freeman v. Zahradnick*, 429 U.S. 1111, 97 S.Ct. 1150, 51 L.Ed.2d 566 (1977) (denial of a grant of certiorari), suggested that the holding of the Court in *Winship* may have effectively modified the *Thompson* standard.

> The *Winship* case held that the Due Process Clause requires proof beyond a reasonable doubt of every element of a criminal offense. A jury must be instructed accordingly. Properly instructed juries, however, occasionally convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt—even when it is clear that the defendant was entitled to a directed verdict of acquittal as a matter of law. In a federal trial, such improper application of law (as defined by *Winship*) to fact requires reversal of the conviction on the ground of insufficient evidence.

> The power of a federal court to review the application of federal law to the facts as found also operates, however, in criminal cases originating in state courts. On direct review of a state court conviction, this Court reviews the application of the "voluntariness" standard to the historical facts to determine whether a confession was admissible, or the application of First Amendment standards to the facts as found to determine whether the conduct in issue was constitutionally protected, to take but two examples. The same rule is applied in federal habeas corpus actions. See generally *Townsend v. Sain*, 372 U.S. 293, 318 [83 S.Ct. 745, 9 L.Ed.2d 770]; *Brown v. Allen*, 344 U.S. 443, 506–507 [73 S.Ct. 397, 97 L.Ed. 469] (opinion of Frankfurter, J.). It is not immediately apparent why application of the beyond a reasonable doubt standard of *Winship* to the historical facts should be any more immune from constitutional scrutiny. If, after viewing the evidence in the light most favorable to the State, cf. *Glasser v. United States*, 315 U.S. 60, 80 [62 S.Ct. 457, 86 L.Ed. 680] a federal court determines that no rational trier of fact could have found a defendant guilty beyond a reasonable doubt of the state offense with which he was charged, it is surely arguable that the court must hold, under *Winship*, that the convicted defendant was denied due process of law.

> What I am suggesting is simply that the question whether there was sufficient evidence to support a finding by a rational trier of fact of guilt beyond a reasonable doubt may be of constitutional dimension. Such a view would not require federal courts to second-guess state court findings of fact or a State's definition of the elements of a crime. Rather, the federal courts would no more than perform a familiar and appropriate role—reviewing the *application* of a substantive federal standard (the requirement of proof beyond a reasonable doubt) to the historical facts.

429 U.S. at 1112–1113, 97 S.Ct. at 1150–1151. In its *Jackson* decision, the Supreme Court may well adopt a "sufficiency of evidence" standard for habeas corpus review, in accordance with the above reasoning of Mr. Justice Stewart.

However, we do not decide the present case on the basis of a conjecture of what the Supreme Court will decide in the future. We conclude that under the prevailing "no evidence" standard of *Thompson v. City of Louisville*, as interpreted in cases such as *Vachon v. New Hampshire* and *Johnson v. Florida*, petitioner is entitled to habeas corpus relief. In so deciding, we do not deem it necessary to determine the applicability of the "totally devoid of evidentiary support" standard relied upon by the district court. Moreover, our decision today does not restrict any option open to the State of Ohio to try petitioner on the various non-murder charges that are suggested by the evidence contained in the present record. The district court's issuance of a writ of habeas corpus is affirmed, for the reasons stated above.

EDWARDS, Chief Judge, concurring.

I concur with Judge Peck in affirming the District Judge's grant of the writ of habeas corpus. I also join his opinion's recital of the facts in this case. I write separately only because I feel I should state my views on the somewhat difficult constitutional problem upon which decision of this case turns.

There are three Supreme Court cases which, taken together, seem to me to require the result which we reach: *Thompson v. Louisville*, 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960); *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1969); *Vachon v. New Hampshire*, 414 U.S. 478, 94 S.Ct. 664, 38 L.Ed.2d 666 (1974).

The holding of the *Thompson* case is:

The ultimate question presented to us is whether the charges against petitioner were so totally devoid of evidentiary support as to render his conviction unconstitutional under the Due Process Clause of the Fourteenth Amendment. Decision of this question turns not on the sufficiency of the evidence, but on whether this conviction rests upon any evidence at all.

*Thompson v. Louisville, supra,* 362 U.S. at 199, 80 S.Ct. at 625.

The holding in the *Winship* case is:

Lest there remain any doubt about the constitutional stature of the reasonable-doubt standard, we explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.

*In re Winship, supra,* 397 U.S. at 364, 90 S.Ct. at 1073.

The holding in the *Vachon* case is:

In these circumstances, the conviction must be reversed. "It is beyond question, of course, that a conviction based on a record lacking any relevant evidence as to a crucial element of the offense charged . . . violate[s] due process." *Harris v. United States,* 404 U.S. 1232, 1233 [92 S.Ct. 10, 12, 30 L.Ed.2d 25] (1971). (Douglas, J., in chambers); *Thompson v. Louisville,* 362 U.S. 199 [80 S.Ct. 624, 4 L.Ed.2d 654] (1960); *Johnson v. Florida,* 391 U.S. 596 [88 S.Ct. 1713, 20 L.Ed.2d 838] (1968); see also *Adderley v. Florida,* 385 U.S. 39, 44 [87 S.Ct. 242, 245, 17 L.Ed.2d 149] (1966).

*Vachon v. New Hampshire, supra,* 414 U.S. at 480, 94 S.Ct. at 665.

These cases show that state court criminal convictions are vulnerable to federal habeas corpus attack where there is failure of proof of an essential element of the crime. *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975). In *Brooks v. Rose,* 520 F.2d 775 (6th Cir. 1975) [1], Judge Weick accurately stated the habeas corpus law which may be deduced from the Supreme Court cases cited above:

[A] conviction which is totally devoid of evidentiary support as to a crucial element of the offense is unconstitutional under the Due Process Clause of the Fourteenth Amendment. *Vachon v. New*

---

1. The dispute between the majority and minority opinion in the *Brooks* case hinged largely upon the question of whether expert testimony of legal insanity was rebutted by the lay testimony. This question is not involved in the instant case and, hence, I see no challenge to the validity of *Brooks*.

*Hampshire,* 414 U.S. 478, 94 S.Ct. 664, 38 L.Ed.2d 666 (1974); *Thompson v. Louisville,* 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960); *Phillips v. Neil,* 452 F.2d 337, 342 (6th Cir. 1971). Such a claim is reviewable in a federal *habeas corpus* proceeding.

*Brooks v. Rose, supra* at 777.

Turning now to the facts of our present appeal, both my colleagues agree there is evidence of guilty conduct on the part of habeas petitioner Speigner. If this record involved Speigner's conviction for possession of a stolen automobile, the habeas petition would doubtless have been summarily dismissed. The same may likewise be said if he, on this same record, had been tried for violating one of the Ohio criminal statutes derived from the common law offense of accessory after the fact of murder. *E. g.,* Ohio Rev.Code Ann. § 2917.22; *State v. Young,* 7 Ohio App.2d 194, 200–01, 220 N.E.2d 146, 151 (1966).

What is clearly lacking in this record is any evidence at all that petitioner Speigner 1) fired either of the fatal shots, or 2) was ever on the scene of the murder or 3) participated in any way in the killing.

Second degree murder in Ohio is defined by statute:

No person shall purposely and maliciously kill another. Whoever violates this section, except in the manner described in sections 2901.01, 2901.02, 2901.-03, and 2901.04 of the Revised Code, is guilty of murder in the second degree and shall be imprisoned for life.

Ohio Rev.Code Ann. § 2901.05.

In the *Vachon* case the Supreme Court opinion summarized the missing element of the crime there involved as follows:

We therefore agree with Justice Grimes, dissenting, that "there is no evidence whatever that the defendant sold the button, that he knew it had been sold to a minor, that he authorized such sales to minors, or that he was even in the store at the time of the sale."

*Vachon v. New Hampshire,* 414 U.S. *supra* at 480, 94 S.Ct. at 665.

Paraphrasing the above, the factual record in this case shows: There is no evidence whatever that the defendant killed Bell, that he participated in any way in the killing, or that he was ever on the scene of the killing. Thus there is no proof whatever of the most essential element of the crime of second degree murder.

I join in the affirmance of the District Court's issuance of the writ in case Ohio does not see fit to try him upon another charge arising out of the events portrayed in this record.

WEICK, Circuit Judge, dissenting.

This appeal in my judgment is governed entirely by the unanimous opinion of the Supreme Court in *Thompson v. City of Louisville,* 362 U.S. 199, 206, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960). *Thompson* was cited with approval in *Johnson v. Florida,* 391 U.S. 596, 88 S.Ct. 1713, 20 L.Ed.2d 838 (1968) (Per Curiam), and has been repeatedly followed by our Court: *Pilon v. Bordenkircher,* 593 F.2d 264 (6th Cir. Feb. 26, 1979); *Blockson v. Jago,* 587 F.2d 10 (6th Cir. 1978) (Per Curiam); *Salter v. Johnson,* 579 F.2d 1007 (6th Cir. 1978) (Per Curiam), *cert. denied,* 439 U.S. 989, 99 S.Ct. 587, 58 L.Ed.2d 663 (1978); *Brooks v. Rose,* 520 F.2d 775 (6th Cir. 1975); *Ballard v. Howard,* 403 F.2d 653 (6th Cir. 1968) (Per Curiam).

The rule of *Thompson v. City of Louisville* was well stated by the Court, and it is not unclear nor ambiguous:

Decision of this question [due process] turns not on the sufficiency of the evidence, but on whether this conviction rests upon *any evidence at all.* [Emphasis added.] [362 U.S. at 199, 80 S.Ct. at 625.]

And further:

Thus we find *no evidence whatever* in the record to support these convictions. [Emphasis added.] [*Id.* at 206, 80 S.Ct. at 629.]

To the same effect is *Vachon v. New Hampshire,* 414 U.S. 478 (1974) (Per Curiam), and cases therein cited.

I do not regard the decision in *In re Winship,* 397 U.S. 358 (1970) as modifying in any respect the settled rule. In *Winship* the Judge, trying a delinquency case involving a juvenile, applied the preponderance of evidence rule for conviction of an offense which, if it involved an adult, would require the application of the reasonable doubt rule. This was clearly error, and the Supreme Court was correct in so holding.

In my opinion the rule in *Thompson* is binding upon us and we have no right to change or to modify it. We ought not to anticipate that the Supreme Court will change this well-established rule.

And, of course, if we have any regard for the rule of *stare decisis,* we ought to follow our own decisions. Other panels of the Court should respect them. No panel of this Court has the power or right to overrule the decision of another panel. *Timmreck v. United States,* 577 F.2d 372, 376 n. 15 (6th Cir. 1978), *rev'd on other grounds,* —— U.S. ——, 99 S.Ct. 2085, 60 L.Ed.2d 634 (1979). Particularly ought this to be true with respect to the consistent decisions of other panels in five additional cases. The overruling should be the function of an en banc court, and not that of a single panel, unless a subsequent Supreme Court decision overrules the decision on which the panel relied.

The majority opinion in the present case admits that "there is 'some' evidence of record which tends to make petitioner's guilt as to the crime charged more likely than not." p. 1209 "As we previously stated, there is 'some' evidence of record which tends to establish, to a degree, that petitioner is guilty of second degree murder." p. 1211 It is of the view, however,—

"... that the 'no evidence' standard of *Thompson,* as it prevails today, incorporates some notion of degree or weight of evidence." (p. 1212)

This view, in my judgment, is incorrect.

It is clear that if such an unwarranted view of the majority is ever adopted by the Supreme Court, the federal courts will be deluged with habeas corpus cases seeking to review state court convictions on the weight or sufficiency of the evidence, which review is not permitted at the present time. In sum, as in the present case and in almost every appeal from a state court criminal conviction, there is included an assignment of error that the conviction is against the manifest weight of the evidence and is not supported by sufficient evidence.

A single District Judge, as in the present case, will, if permitted by a change in the rule, pass upon the weight or sufficiency of the evidence, and will draw inferences from circumstantial evidence, which inferences were within the sole domain of the trier of the facts, namely, the state court jury, subject of course to review for errors cognizable under state law, by the state court trial judge, the state court of appeals, and the state supreme court. State court judges are certainly more adept to rule on these matters of state law than are the federal judges.

We ought not to forget the Resolution adopted some time ago by the Conference of Chief Justices of the State Supreme Courts, which Resolution severely criticized the federal practice then prevailing of a single federal District Judge reviewing, as if on direct appeal, and setting aside, as in the present case, a state court conviction that had been affirmed by the highest courts in the state.

Obviously the rule in *Thompson* was designed to curtail unnecessary federal intrusions upon state court convictions. In order to ameliorate the ill feeling caused thereby, Chief Justice Burger appointed Federal-State Judicial Councils to meet and discuss the problems. To now change the rules, as the majority suggests, the former practice, accompanied by all the ill feeling caused thereby, will certainly be revisited upon us.

Although the majority opinion admits that there was "some" evidence, what it is really complaining about is that there were no eye witnesses to the brutal assault, murder, and theft of the victim's car. There was, however, an abundance of circumstantial evidence from which the trier of the

facts could and did draw inferences as to the assault, theft, and murder. Circumstantial evidence is just as reliable as direct evidence, and could be more reliable because witnesses can lie.

The circumstantial evidence is detailed in the opinion of the state court of appeals, a copy of which opinion is annexed hereto as Exhibit "A". The instructions to the jury of the learned trial judge are also annexed thereto as Exhibit "B". No claim was made that these instructions were erroneous.

In brief, the evidence tends to prove that the vicious assault and murder where committed upon the innocent black victim by the *two* thugs who stole his automobile. This was shown conclusively by the circumstance that the victim was shot from the front with a pistol, and in the back by a shotgun. The victim's type "A" blood was spattered over the back seat of his automobile. A shotgun was found protruding from under the front seat in the stolen automobile, which seat was occupied by the passenger Speigner. The pistol was never found. It could have been thrown away by Scott, the driver of the stolen car, while Scott was driving to Youngstown. A single individual with a pistol would not ordinarily shoot a person with a pistol, from the front, then use a shot gun to shoot him from the back. At least the jury could and did, rightfully, infer that two persons were involved in the assault, murder, and theft of the car.

The victim's automobile was stopped by the state highway police for a routine safety inspection, at the Niles-Youngstown interchange of the Ohio turnpike, at 5:02 a. m., on June 26, 1973, because the car appeared to be in an unsafe condition. This interchange is located about an hour's drive from Cleveland where the body of the victim was found a short time later, lying in a street.

The driver of the victim's automobile was Roger Scott, who was on parole from an earlier felony conviction in Ohio for grand larceny. Riding in the passenger's seat was Scott's confederate, appellant Henry Speigner, alias Frank Mathews, who also was on parole for a previous Ohio felony conviction, namely, upon his plea of guilty to malicious destruction of property and possession of burglary tools. It is again noteworthy that a shotgun was protruding from underneath the seat in the victim's car occupied by Speigner.

At the time of the safety inspection by the police, Speigner identified himself as Frank Mathews, by exhibiting an alias welfare card. Upon questioning by the police it was stated by Scott that they had borrowed the car from the black victim, William Bell, for fifteen dollars, and both men laughed at the fact that they had been "stuck" with a unsafe vehicle.[1] The highway patrol officer verified that the car belonged to Bell. Scott was held in lieu of $50-bond on the unsafe vehicle charge, and because Scott was apparently a parole violator. Speigner was released when he promised to obtain the $50-bail for Scott. Speigner never returned.

Instead, the evidence was to the effect that Speigner traveled to Cleveland, stayed for a few days, and then left for various cities, including San Francisco, Las Vegas, St. Louis, and New York. When apprehended by New York authorities on April 10, 1974, over a year later, and turned over to the Cleveland police, Speigner admitted that he knew that the Cleveland police had been looking for him. He also acknowledged that he knew both the victim, William Bell, and Roger Scott.

An inventory of Bell's car on the morning of June 26th disclosed that the vent window of the driver's door had been broken and that glass was scattered on the floor. There were blood stains on the rear seat which matched the victim's blood type "A", as well as a bloody fingerprint of undetermined origin on the right front door. In

1. Scott testified in his separate trial that Speigner told him that he, Speigner, had borrowed the car from Bell; that he, Scott, knew nothing of Bell's death. This testimony conflicted with statements which Scott had earlier given to police. Appellee's App. 64b, filed in *Scott v. Perini,* Sixth Circuit Court of Appeals.

addition, a sawed off shotgun was found protruding several inches from under the front passenger's seat, which had been occupied by Speigner. A subsequent scientific examination did not indicate any fingerprints on the shotgun, nor was it testfired, as it would not be possible to test the pellets. There was ample proof to establish that Bell was shot in the back by a shotgun, even though the particular shotgun was not received in evidence. Fingerprints of both the victim Bell and Speigner were found on the car, although neither were bloody fingerprints. Finally, the trunk of Bell's car contained his brief case filled with court documents and checks made out to Bell. Testimony disclosed that Bell had been retained as a filing clerk by a number of Cleveland attorneys, and was subject to call 24 hours a day; and that the items found in his briefcase were the filings for the morning of June 26, 1973. Testimony by Bell's father indicated that Bell's car was used all the time by Bell in his business and that Bell would not lend his car to anyone, not even to his brothers. The testimony of Bell's father was corroborated in part by the testimony of Attorney Summers.

In concluding that the conviction was devoid of evidentiary support Federal District Judge Battisti disagreed with the state trial judge, the state Court of Appeals, and the Supreme Court of Ohio. The state appellate court, in addressing this issue, and after summarizing the circumstantial evidence, stated:

> As can be seen from this summary of the state's case, there was sufficient amount of probative evidence presented to the jury to enable it to find beyond a reasonable doubt that the appellant purposely and maliciously killed William Bell. The state's evidence, although largely circumstantial, was of such a nature as to be irreconcilable with any reasonable theory of the appellant's innocence. *State v. Kulig*, (1974), 37 Ohio St.2d 157 [309 N.E.2d 897]. The trial

court acted correctly in not granting a directed verdict to the appellant.[2] [A. 32b]

The Supreme Court of Ohio, in sua sponte dismissing Speigner's appeal, decided:

> *75–916 State, Appellee, v. Henry Speigner, Appellant,* Cuyahoga County. Appeal from the Court of Appeals. Dismissed sua sponte, no substantial constitutional question involved. O'Neill, C. J., Herbert, Corrigan, Stern, Celebrezze, W. Brown, and P. Brown, JJ., concur.

Thus we have a situation where a single Federal District Judge in a collateral attack has overruled and set aside the decisions of the Common Pleas Court, the State Court of Appeals, and the state's highest court, namely, the Supreme Court of Ohio, the disagreement being over evidentiary issues, namely, circumstantial evidence and the inferences properly deducible therefrom, all of which were properly within the domain of the state courts to determine under state law.

The Supreme Court of Ohio has adopted our standard for review, set forth in *United States v. Collon*, 426 F.2d 939 (6th Cir. 1970), governing the determination of motions for judgment of acquittal, in *State v. Hancock*, 48 Ohio St.2d 147, 151–52, 358 N.E.2d 273, 276 (1976), quoting from *Collon*, as follows:

> "In determining the sufficiency of the evidence to withstand a motion for a judgment of acquittal, the evidence and all reasonable inferences that may be drawn therefrom must be viewed in the light most favorable to the government. * * * And if under such view of the evidence it is concluded that a reasonable mind might fairly find guilt beyond a reasonable doubt, the issue is for the jury. However, if under such view of the evidence it is concluded there must be some doubt in a reasonable mind, the motion for acquittal must be sustained."

---

2. In the same opinion the state Court of Appeals affirmed another judgment of the Common Pleas Court which sentenced Speigner to the Ohio penitentiary for violation of his parole

on a previous conviction upon his plea of guilty to the crime of malicious destruction of property and possession of burglary tools.

See also *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Scott*, 578 F.2d 1186, 1192 (6th Cir.), *cert. denied*, 439 U.S. 870, 99 S.Ct. 201, 58 L.Ed.2d 182 (1978).

It is significant that in the state Court of Appeals Speigner's claim of error was not that his conviction was unsupported by *any* evidence, but only that his conviction was against the manifest weight of the evidence and was not sustained by sufficient evidence. He made no claim in the state courts that there was not *any* evidence to support his conviction. The state courts therefore were not called upon and were never given opportunity to rule on the constitutional issue which Speigner raised for the first time in his habeas corpus petition filed in the District Court. He has not exhausted his state remedy.

From the established circumstances it could reasonably be inferred that the shots were fired by two people who had brutally beaten Bell. The two people in Bell's car when it was stopped by the police shortly after the assault, murder, and theft, were Scott and Speigner. They gave no explanation to the police as to how the front vent window of the car happened to be broken, or how it happened that blood was spattered on the rear seat of the car and on the right front door. The jury had the right to draw inferences from these established circumstances.

Speigner gave an assumed name, Mathews, to the police when they were stopped near Youngstown; then he left, as he stated, to get bail for Scott, but he never returned; instead, he proceeded to a number of different cities until the police finally caught him in New York, seven months later. This constituted flight.

The jury could find from the evidence that Scott and Speigner were in the exclusive possession of an automobile recently stolen by them from Bell; that the explanation which they gave was unsatisfactory, and indeed was false; that because blood of Bell's type "A" was found in Bell's car, Bell was shot in his car, or that his body was placed in his car after he was shot.

In *United States v. Jennewein*, 590 F.2d 191, 192 (6th Cir. 1978), we stated:

Upon reconsideration it is concluded that the instruction, "[p]ossession of property recently stolen if not satisfactorily explained is . . . ordinarily a circumstance from which the jury may reasonably draw the inference and find in the light of surrounding circumstances shown by the evidence in this case that the person in possession not only knew it was stolen property but also participated in some way in the theft of the property," did not misstate the applicable law. *See United States v. Nalley*, 455 F.2d 259 (6th Cir. 1972); *United States v. Lipscomb*, 425 F.2d 226 (6th Cir. 1970); *Prince v. United States*, 217 F.2d 838 (6th Cir. 1954), and cases therein cited.

*See also Pendergrast v. United States*, 135 U.S.App.D.C. 20, 416 F.2d 776, *cert. denied*, 395 U.S. 926, 89 S.Ct. 1782, 23 L.Ed.2d 243 (1969); Devitt and Blackmar, *Federal Jury Practice and Instructions*, Vol. 1 §§ 15, 29, 44.11; 34 O.Jur.2d *Larceny* § 71. Flight is regarded in Ohio as evidence of guilt unless satisfactorily explained. Temp. 15-A O.Jur.2d *Criminal Practice and Procedure* § 343. Speigner and Scott's explanation was not satisfactory. It was a deliberate falsehood.

In his opinion granting the writ the District Judge stated:

However, to find guilt in this case, the jury must have made a series of double inferences, basing one inference upon another. Where one inference is based not upon fact, but only upon conjecture or speculation, and the prosecution's case is composed entirely of these inferences, there must be reasonable doubt of the defendant's guilt, and therefore, the prosecution has not proven its case. *Cf., United States v. Ravich*, 421 F.2d 1196, 1204 n. 10 (2d Cir.), *cert. den'd*, 400 U.S. 834, 91 S.Ct. 69, 27 L.Ed.2d 66 (1970).

This statement presents the issue in the present appeal as to who should draw the inferences from the proven circumstances. It is respectfully submitted that the jury in the state court which heard the evidence

and observed the demeanor of the witnesses, had the lawful right and was in a better position to draw the inferences than a single federal judge, examining a cold record. The inferences were drawn from proven circumstances and were not drawn upon conjecture or speculation as was erroneously stated by the District Judge.

In *United States v. Johnson*, 412 F.2d 787, 788 (6th Cir.), *cert. denied*, 396 U.S. 993, 90 S.Ct. 489, 24 L.Ed.2d 456 (1969), Judge McCree, who wrote the opinion for the Court, stated:

Nevertheless, possession may be proved circumstantially and may thus serve as the basis for an inference of the other elements of the offense. *United States v. Costanzo*, 395 F.2d 441 (4th Cir. 1968). Also, possession may be in more than one person. *Garrison v. United States*, 353 F.2d 94 (10th Cir. 1965); *Wheeler v. United States*, 382 F.2d 998 (10th Cir. 1967). Although the evidence offered here to establish possession was neither direct nor extensive, it was sufficient to permit the jury to find that appellant was more than a mere passenger in the stolen vehicle. He had been traveling with his brother before the theft and was apprehended with his brother afterwards. The luggage they were observed to possess before the theft somehow had been transferred to the stolen car. The car in which he was seen in Orlando before the theft had apparently been abandoned. We hold that the foregoing evidence sufficed to permit a jury to find that appellant had at least joint possession of the stolen motor vehicle and that from this fact it could infer the other elements of the offense charged in the indictment. *Burke v. United States*, 388 F.2d 286 (8th Cir. 1968).

See also *United States v. Tate*, 575 F.2d 1152 (6th Cir.) (Per Curiam), *cert. denied*, 439 U.S. 856, 99 S.Ct. 170, 175, 58 L.Ed.2d 163 (1978).

Thus, as before related, there was substantial circumstantial evidence tending to prove every crucial element of the crime of murder in the second degree. These circumstances include:

1 Exclusive possession of the recently stolen automobile of the victim, with its rear seat spattered with the victim's blood;

2 Instead of giving a satisfactory explanation of the possession of the stolen automobile, the explanation given was a deliberate falsehood;

3 Flight.

The District Judge did not explain how, not being in the jury room, he could divine that the jury made a series of double inferences. He was in error in his statement that the prosecution's case is based on conjecture or speculation, and is composed entirely of a series of double inferences. The wealth of circumstantial evidence hereinbefore related and stated in the opinion of the state appellate court, from which legitimate inferences may be drawn, refutes the statements made by the District Judge and establishes his error.

The jury could have drawn inferences from a number of different facts and circumstances established by the evidence. These are not double inferences, as they were drawn from different circumstances.

The District Court further stated:

The prosecutor's theory of the case, which evidently assumed (without evidentiary basis) that petitioner and the driver of the victim's car had robbed and beaten Bell, shot him, and stolen his car, is one explanation for the facts that were proven. It would, however, be equally reasonable to infer that a third person killed Bell in a fight since there is no evidence, direct or circumstantial, connecting petitioner to the time or place of the crime. The defense's failure to set forth an alternative theory does not mean that the facts "are consistent only with the theory of guilt and irreconcilable with any reasonable theory of [petitioner's] innocence." *State v. Kulig*, 37 Ohio St.2d 167 [157], 160 [309 N.E.2d 897] (1974).

In accordance with Ohio law, the trial judge charged the jury that the prosecutor was required to prove that "a person,

that is, the Defendant, committed the crime as described to [the jury]." TR. 379–80. However, since there was simply no proof of this element of the crime, the jury should not have been permitted to consider it. Without proof of each and every essential element of the crime charged, the state has not met its burden of proof under Ohio law. *State v. Ellis*, 61 Ohio L.Abs. 434, 105 N.E.2d 65 (Ct. App. Franklin [County] 1951). A conviction which does not satisfy the state standard certainly fails to afford the due process guaranteed by the fourteenth amendment to the federal constitution. [A. 61b]

It is obvious from the above that the District Judge has denied the state court jury the right to draw inferences from the proven circumstances, and arrogates to himself the right to draw inferences different from those drawn by the jury, which inferences he admits to be equally reasonable to the inferences which he has drawn. The District Judge did not follow the state law and the decisions of this Court that the evidence must be considered in the light most favorable to the government. The state standard was satisfied as the state courts held. There was substantial evidentiary basis for the state's case, as we have recited herein. Much of the evidence supporting the conviction is not even mentioned by the District Judge in his opinion.

It is submitted that no constitutional violation of Speigner's rights can be found in his state court conviction.

The crime of murder is not ordinarily committed in the presence of witnesses. In many criminal cases the state must rely on circumstantial evidence in order to obtain a conviction. Circumstantial evidence is just as trustworthy as direct evidence, and is regarded by many as more trustworthy because eye witnesses will lie sometimes.

The inferences to be drawn from proven circumstantial evidence are drawn by the trier of the facts, the juries in criminal cases, and cannot be drawn by either state or federal Judges. The Judges have no right to substitute their judgment for that of the jury on the factual issues. Under the proven circumstances in the present case, and the inferences logically deducible therefrom, the verdict of the jury finding Speigner guilty of second degree murder was supported by substantial evidence, as was held by all of Ohio's courts. Likewise, it is for the state jury to determine whether the evidence is beyond a reasonable doubt and the judgment of conviction affirmed by the state's highest courts cannot be collaterally attacked in the federal courts.

It is interesting to note that Scott and Speigner were tried separately in the Court of Common Pleas of Cuyahoga County, Ohio. They were each convicted by juries, Scott of murder in the first degree, and Speigner of murder in the second degree. They were each sentenced to life imprisonment. Both appealed to the Court of Appeals of the Eighth District of Ohio, which Court sits in Cleveland. On appeal each asserted, among other errors, that his conviction was against the manifest weight of the evidence. The appellate court affirmed Speigner's conviction on July 31, 1975, and modified Scott's conviction on November 24, 1975, by reducing it to murder in the second degree, and affirmed it as modified.

Scott's habeas corpus petition was heard by District Judge Walinski of the Northern District of Ohio, Western Division. In his petition Scott relied on errors other than the weight or sufficiency of the evidence. Judge Walinski denied the writ and we affirmed by order in *Scott v. Perini*, 6 Cir., 564 F.2d 100, on October 18, 1977, panel Phillips, Chief Judge, Peck, Circuit Judge, and Gray, Senior District Judge.

Since the decision of the majority affirms the judgment of the District Court, Judge Battisti granting the writ of habeas corpus, Speigner is set free and cannot be retried (as the state has no eye witnesses) except that he may be tried—

> . . . on the various non-murder charges that are suggested by the evidence contained in the present record. [Majority opinion, p. 1215.]

These "non-murder charges" are assault and theft of the victim's automobile. Theft

may be inferred by possession of a recently stolen automobile without giving any satisfactory explanation. The majority does not explain how circumstantial evidence could possibly convict Speigner on the non-murder and theft charges if it was insufficient, as the majority holds, to convict him on the murder charge.

The result of the holding of the majority also presents a very anomalous situation where Speigner's confederate, Scott, is denied a writ of habeas corpus on substantially the same evidence, by a Judge sitting in the Western Division of the Northern District of Ohio, and our Court, by a different panel except for the Judge who wrote the majority opinion in the present case, affirms the denial of the writ to Scott. Scott's confederate, Speigner, however, filed his petition for writ of habeas corpus which was heard by a different District Judge (Judge Battisti, who sits in the Eastern Division of the Northern District of Ohio), and Judge Battisti granted the writ, and upon appeal the majority in the present case affirms.

We can all rest assured, however, that as soon as Scott learns of the good fortune of his confederate Speigner, he will file a new habeas petition so that he likewise can be set free. We ought not to denigrate circumstantial evidence which was adequate to convict both Scott and Speigner. It certainly can never be said that the judgments of conviction were not supported by "any evidence at all." *Thompson*, 362 U.S. at 199–206, 80 S.Ct. 624.

The cause of justice will be promoted only when the two murderers of William Bell are punished for their crimes. The crime wave existing in Cleveland will never be curtailed if Federal Courts persist in intruding upon and setting aside state court convictions approved by the state's highest court, and upon such unsubstantial grounds as exist in the present case.

I would reverse the judgment of the District Court granting the writ of habeas corpus to Speigner, so that the two murderers of William Bell will receive the same punishment for the crimes which they committed.

### EXHIBIT "A"

In his first assignment of error the appellant contends that the verdict finding him guilty of second degree murder is against the weight of the evidence. He argues that the evidence adduced at trial against him is insufficient to support a conviction. We disagree. The first assignment of error is not well taken.

A summary of the key testimony in the case will disclose just what the state's evidence consisted of and how it was sufficient to enable a jury of reasonable persons to find the appellant guilty of second degree murder beyond a reasonable doubt.

Doctor Charles Hirsch of the Coroner's Office testified that the causes of the death of the victim, William Bell, were a gunshot wound to the chest and a shotgun wound to the back. Doctor Hirsch indicated that the victim had suffered many broken ribs and scrapes, and that he had died sometime late on the evening of June, 25, 1973 or sometime early in the morning on June 26, 1973. Doctor Hirsch also testified that the victim had type "A" blood.

Mary Cowan of the Trace Evidence Department of the Coroner's Office testified that both shots fatal to Bell had been fired at close range, and that a residue test administered to the hands of the victim indicated either that he had fired a weapon before he died or that possibly residue from a gun fired at him had come to rest on his hands.

A Mr. Larue Perryman testified that on the morning of June 26, 1973 a lady told him there was a body laying in the street. He testified that he went to the body, which was laying at E. 75th and Platt Ave. in the City of Cleveland, and that after he saw it he then called the police. Perryman identified the body he saw on the morning of June 26, 1973 as that of William Bell.

Sergeant Donald R. Little of the Ohio State Highway Patrol testified that on June 26, 1973 he was working on the Ohio Turnpike, that at about 5:02 a. m. he observed a 1964 Chevrolet Nova approach the

toll booths for the Niles-Youngstown interchange, that he observed the car to be an unsafe vehicle and therefore stopped it, that there were two occupants of the car, a driver named Roger L. Scott and a passenger identified as the appellant, and that he ascertained that the owner of the vehicle was one William Bell of Cleveland. Sergeant Little indicated that neither Scott nor the appellant could produce proof of ownership of the car and that Scott told him that they had borrowed the car from William Bell for $15. Little further testified that he arrested Scott but that the appellant was released, that at the time he was released the appellant stated to him (Little) that he was going to obtain bond money for Scott, but that the appellant never returned to bail out Scott. Sergeant Little further testified that he and Patrolman Hawkins conducted a routine inventory of the 1964 Nova; that in doing so they found a bloody fingerprint on the right hand passenger door and a large smudge of blood on the upper left portion of the rear seat; that he found an attache case in the trunk of the car filled with court documents and checks belonging to William Bell or bearing the name of William Bell; that Patrolman Hawkins found a sawed-off shotgun underneath the front seat on the passenger side, and that they observed that the glass was broken out of the vent window located on the left front driver's door of the car. Little indicated that he had stopped the appellant and Scott approximately sixty miles from downtown Cleveland.

Patrolman Robert Hawkins of the Highway Patrol essentially corroborated the testimony of Sergeant Little. Hawkins described the blood on the upper left portion of the rear seat as being at about shoulder height. One of the exhibits admitted into evidence indicated that the victim had a gaping shotgun wound in the upper left portion of his back just below his left shoulder. Hawkins described for the jury how he found the sawed-off shotgun under the front passenger seat of the car.

John Busher of the Automobile Title Department of the Cuyahoga County Clerk's Office testified that the owner of the 1964 Nova was the victim, William Bell.

Robert Bell, the victim's father, and William Summers, an attorney who was one of the users of the victim's court filing service, both presented testimony inconsistent with the statement of Roger Scott to Sergeant Little that Bell had made a loan of his car for $15. Robert Bell testified that his son William never let his brothers use his car. Summers testified that the victim's filing service required him to be on call twenty-four hours a day and required him to use a car.

Detective John Lavelle of the Cleveland Police Department testified that he and his partner Timothy Patton had investigated this homicide and that they had taken custody of the appellant from the New York City Police Department on April 10, 1974. Detective Lavelle stated that while in custody and after he had been advised of his rights the appellant had told him that he (the appellant) knew the Cleveland Police were looking for him, that between June 26, 1973 and April 10, 1974 he had been in Cleveland, San Francisco, Las Vegas, St. Louis and New York City, that he knew the deceased William Bell, and that he knew Roger Scott.

Lawrence Palahunic of the Scientific Investigation Unit of the Cleveland Police Department was the last state's witness. He testified that the bloodstains found on the upper left portion of the rear seat of the 1964 Nova consisted of type "A" blood.

Although the sawed-off shotgun was not admitted into evidence by the trial court, several state's witnesses gave testimony, heard by the jury, identifying it and describing the conditions under which it was found while attempting to lay a foundation for the shotgun's admission. Therefore, even though the jury was not able to take the shotgun to the jury room with it, it had ample testimony on this item of evidence anyway.

As can be seen from this summary of the state's case, there was a sufficient amount of probative evidence presented to the jury to enable it to find beyond a reasonable doubt that the appellant purposely and maliciously killed William Bell. The state's evidence, although largely circumstantial,

was of such a nature as to be irreconcilable with any reasonable theory of the appellant's innocence. *State v. Kulig* (1974), 37 Ohio St.2d 157 [309 N.E.2d 897]. The trial court acted correctly in not granting a directed verdict to the appellant.

### EXHIBIT "B"

[From Common Pleas Court Judge's instruction to the jury]

Now, there are two kinds of evidence, generally speaking. One is positive and direct, and the other is circumstantial.

That which is positive or direct is that which we see or hear with our senses or we feel it with our hands or through a sense of feeling. So if a witness testifies from his personal knowledge to the commission of an act or any circumstances to be proven in order to establish an offense, that is called direct and positive evidence.

Now, it is not always possible to ascertain the truth by evidence of this character. Hence, the law permits the introduction and consideration of what is called circumstantial evidence.

Evidence may also be used to prove a fact by inference. This is referred to as circumstantial evidence. That is different from the direct or positive evidence, when you say, "I saw something, I saw this, I saw that, I heard this, I felt this."

So from the positive evidence that you may have heard, you have the right to infer other facts reasonable facts or conclusions which usually follow the facts that you have heard.

Circumstantial evidence is the proof of facts by direct evidence from which you may infer other reasonable facts or conclusions.

In the absence of direct evidence, circumstantial evidence by itself will justify a finding of guilty only if the circumstances are entirely consistent with the Defendant's guilt, or wholly inconsistent with any reasonable theory of the Defendant's innocence and are so convincing as to exclude a reasonable doubt of the Defendant's guilt.

Where the evidence is both direct and circumstantial, the combination of the two must satisfy you of the Defendant's guilt beyond a reasonable doubt.

On drawing inferences, you may not make one inference from another inference, but you may draw more than one inference from the same facts or circumstances. If the circumstances create inferences that are equally consistent with either innocence or guilt, such inferences must be resolved in favor of the Defendant's innocence.

I think an illustration was given to you by one of the counsel, that if you come into this building, when you come in, all of the streets outside are dry, the tops of the roofs are dry and the tops of automobiles are dry, and you do not have an opportunity to look out, but when you go outside the street is covered with snow or automobiles are covered with snow, you didn't see it snow because you didn't look, but you have a right to infer what is reasonable, that it did snow while you were inside. That is what we mean by circumstantial evidence. It is a law of inference based upon proven facts.

If the circumstances create inferences that are equally consistent with either innocence or guilt, such inferences must be resolved in favor of the Defendant's innocence.

Now, in the illustration the Court gave you, you would not have a right to go ahead and infer what time it snowed and the kind of snow, and that sort of thing, unless you had some facts outside that you saw by direct evidence upon which you could base your inference.

You are the sole judges of the weight to be given to the circumstantial evidence, as you are to the direct evidence.

When circumstantial evidence is of the nature and character that it satisfies and convinces the minds of the jury beyond a reasonable doubt, then such circumstantial evidence alone is sufficient upon which to base a verdict of guilty.

However, to warrant you in finding the Defendant guilty on circumstantial evidence alone, each material and important link in the chain of circumstances relied upon for conviction must be proven to your satisfaction beyond a reasonable doubt.

On Petition for Rehearing

ORDER

■ Respondent-appellant's motion for rehearing having come on to be considered and of the judges of this Court who are in regular active service less than a majority having favored ordering consideration en banc, the motion has been referred to the panel which heard the appeal. Because the Supreme Court in effect broadened the scope of federal habeas corpus review in *Jackson v. Virginia*, ⸺ U.S. ⸺, 99 S.Ct. 2781, (1979), we see no need to reconsider our decision in *Speigner v. Jago*, 603 F.2d 1208 (6th Cir., June 13, 1979). Obviously, the grant of habeas corpus relief under the narrow "no evidence" standard of *Thompson v. Louisville*, 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960), is not effected by the establishment of the broader standard of *Jackson*. Accordingly,

IT IS ORDERED that the petition for rehearing be and it hereby is denied. Judge Weick adheres to his dissent for the reasons stated therein. Judge Weick is of the opinion that the inferences drawn from the record by the jury were permissible and the rulings thereon by the Ohio courts were not irrational.