**Roger SCOTT, Petitioner-Appellee,**

v.

**E. P. PERINI, Superintendent, Respondent-Appellant.**

No. 80–3219.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 4, 1980.

Decided Sept. 30, 1981.

Rehearing and Rehearing En Banc Denied Dec. 10, 1981.

Simon B. Karas, Asst. Atty. Gen., Columbus, Ohio, for respondent-appellant.

Paul Mancino Jr., Cleveland, Ohio (court-appointed), for petitioner-appellee.

Before ENGEL, MERRITT and JONES, Circuit Judges.

ENGEL, Circuit Judge.

Petitioner Roger L. Scott and Henry F. Speigner, also known as Frank Mathews, were charged in an indictment issued by a grand jury in Cuyahoga County, Ohio, with the first degree murder of William Bell on June 26, 1973. The two men were tried separately. A jury found Scott guilty of first degree murder. Speigner was subsequently convicted of second degree murder. The Ohio Court of Appeals reduced Scott's conviction to the lesser included offense of second degree murder finding insufficient evidence to support the first degree murder conviction.

Scott alleged in his petition for habeas corpus relief that the evidence was insufficient to sustain his conviction for second degree murder under Ohio law. The district court agreed and accordingly granted Scott relief. The State of Ohio appeals. We reverse.

Because our court has held that the evidence presented in Speigner's case was insufficient as a matter of law, *Speigner v. Jago*, 603 F.2d 1208 (6th Cir. 1979), *cert. denied* 444 U.S. 1076, 100 S.Ct. 1023, 62 L.Ed.2d 758 (1980), and because the sufficiency of the evidence is also an issue in this case, we are required to review the evidence in considerable detail.

## I.

William Bell was a 32 year old black male who lived and worked in Cleveland, Ohio.

Bell, after being released from prison, established a business filing court papers for numerous attorneys in the Cleveland area. He also did some investigatory work for the attorney who helped him start the business. Bell carried a gun on these investigatory assignments. His 1964 Chevrolet was essential to the business; accordingly, he was reluctant to lend the vehicle even to members of his family.

William Bell's murdered body was sighted in Cleveland on the morning of July 26, 1973. Detective LaVelle of the Cleveland Police Department homicide unit proceeded on assignment to the isolated area of East 76th and Platt Avenue where he found Bell lying face up among the debris on the street. When the body was moved for transport to the morgue, Detective LaVelle observed a large blood spot where Bell's back had been in contact with the asphalt.

A detailed examination took place at the morgue. Bell, a small man at 5'5" and 112 pounds, was fully clothed. A Timex watch on his left wrist had stopped at 10:53. Detective LaVelle testified that an empty black leather holster was found on the body. Dr. Adelson, the chief deputy coroner of the Cuyahoga County Coroner's Office, observed track marks on Bell's arms which indicated previous narcotics use. Dr. Adelson opined that the use had not been recent, but was unable to rule out the possibility that Bell had used narcotics as early as two weeks before his murder.

As a result of his autopsy, Dr. Adelson discovered that Bell's death was caused by two gunshot wounds. One bullet entered Bell's chest, passed through his lung, fractured some ribs, and came to rest in the left back area. Dr. Adelson stated this wound was inflicted by a rifled weapon. Detective La Velle identified the bullet recovered by Dr. Adelson as being of .32 caliber. The second gunshot wound resulted from a shotgun blast fired from close range at the left shoulder blade region of Bell's back. Dr. Adelson described the wound left by this shot as being pear shaped with a diameter of one and a half inches. An x-ray revealed thirteen pellets in the back of Bell's head and neck.

Dr. Adelson also determined that Bell had nine broken ribs. The ulna in his left arm had been fractured. There were lacerations, tears and abrasions over Bell's face, neck and chest. Dr. Adelson found from testing Bell's blood and urine that he had been drinking; his blood alcohol was .19. His urine also indicated the presence of phenothiazine, a tranquilizer.

Dr. Adelson estimated the time of death as between 11:00 p. m. and 2:00 a. m. the night before, based in part on the fact that rigor mortis had set in. The time of death could have been as late as 3:30 a. m., however, if there had been a violent physical struggle which would hasten the onset of rigor mortis.

Bell's 1964 Chevrolet was also found by the police on the morning of July 26, 1973. At 5:00 a. m. Sergeant Little of the Ohio Highway Patrol stopped a car at the Youngstown Interchange of the Ohio turnpike because of its apparent unsafe condition. Sergeant Little observed that the car had no taillights and that it was quite noisy.

Roger Scott was driving the car and Henry Speigner, also known as Frank Mathews, was a passenger. Scott was unable to produce the registration to the vehicle and possessed only an expired driver's license. Scott indicated to Sergeant Little that they had borrowed the car from William Bell for $15.00. Since Scott was unable to post the bond required for the unsafe vehicle citation, he was transported to the Mahoning County jail. Speigner was released and failed to return with the bond for Scott. He was eventually apprehended on armed robbery charges in New York.

Sergeant Little inventoried the 1964 Chevrolet, which had been pulled into an adjacent parking lot, around 7:30 that morning. He discovered a blood stain across the back seat of the car where a person's back would rest. He noted that the front vent window was broken and that glass from this window was on the floor of the car. Sergeant Little testified that the ignition was intact and that the key was present. Upon examination of the trunk, Sergeant Little found an attaché case containing court documents and uncancelled checks. Sergeant Little also discovered some clothing on the floor of the vehicle.

Patrolman Hawkins, also of the Ohio Highway Patrol, assisted Sergeant Little in inventorying the contents of the car. He discovered a sawed-off shotgun under the passenger seat of the vehicle. Patrolman Hawkins did not locate any ammunition. He also corroborated much of Sergeant Little's testimony and asserted that there were dried blood stains both across the rear seat and on the front passenger seat of the car.

Three policemen were involved in examining the car after it had been towed to a tow yard. Detective Tekautz of the Cleveland Police Department dusted the interior and exterior of the car for fingerprints. He was able to obtain prints from the right door post, a paper bag found under the steering wheel, the rear view mirror, the left rear door ashtray cover, the left door vent window, and the outside portion of the passenger's window. Detective Birt of the Cleveland Police Department attempted to match these fingerprints with those of Scott, Speigner and the victim Bell. A print found on the right door post matched that of Speigner and the print found on the paper bag matched that of Bell. None of the prints matched those of Scott. Detective Palahunic of the Cleveland Police Department performed an analysis on the stain across the back seat. He determined the dried stain to be Type A blood. Mary Cowan, a medical technologist on the coroner's staff, testified that Bell's blood was also Type A. There was testimony that Type O blood was the most common, but that twenty percent of the population had Type A blood.

Later on the afternoon of July 26, after being informed that he was under arrest for investigation in connection with a homicide, Scott was taken by Detective LaVelle from the Mahoning County jail in Youngstown to Cleveland, a trip which takes approximately one hour. En route, Scott sought to explain the events of the previous evening. He stated that he was having a few drinks in Ellis' bar with Frank Math-

ews and William Bell. He and Mathews rented Bell's car for $15.00 for the evening. They took Bell to the vicinity of East 76th and Central Avenue where they "dropped him off." They rode around for a while, stopping at various locations in Cleveland. According to Scott, Mathews then decided to drive to Youngstown. Scott relieved him at the wheel when he became tired. Detective LaVelle stated that the police were unable to obtain corroboration of Scott's explanation from anyone at Ellis' bar. He also testified that Scott refused to give him a written statement two days later.

On the same day, Cleveland Police Detective Leppelmeier interrogated Scott at the Cleveland Central Prison Unit interrogation room. Scott gave a different version of the events which took place during the previous evening. He asserted that a friend of his for about six years, known only as Frank, offered him a ride around 10:00 p. m. on the corner of East 83rd and Quincy Avenue. Scott, who admitted knowing Bell for 15 years, explained that he thought the car belonged to Frank. After driving through the city for a couple of hours, Frank dropped Scott off at the Grape Vine Tavern and said that he was going to look for someone named "Willie." Frank returned and picked up Scott about fifteen or twenty minutes later. They proceeded toward Youngstown at Frank's suggestion. Scott took over driving the vehicle when Frank became tired.

Scott testified on his own behalf at the trial. He explained the events of the night before and came up with a third account of his activities. According to this account, Henry Speigner picked him up on the corner of 83rd and Quincy. The two of them visited different bars and people's houses. Speigner dropped him off for a short time

on Central, but returned to pick him up close to midnight. They continued to cruise around and finally decided to proceed toward Youngstown. After changing a flat tire, Scott took over the driving. Scott knew the car belonged to Bell, and Speigner informed him that he had rented the car from Bell. Significantly, Scott denied seeing Bell the evening of the murder, but asserted he had seen him before 5:00 p. m. that day.

In addition to this explanation, Scott denied telling Detectives Leppelmeier and LaVelle much of the statements they recounted. He denied knowing Speigner under the alias of Frank Mathews and explained that his inability to identify a picture of Speigner shown to him by Detective Leppelmeier on June 26 was caused by the use of the name Frank Mathews and the fact that Speigner sported facial hair in the picture. Scott also admitted past convictions for drug possession (1958), burglary (1965), and grand larceny (1969). He and Speigner had previously spent time together in prison.

Scott denied any knowledge of or involvement in Bell's murder.

## II.

██ The constitutional standard for reviewing the sufficiency of the evidence was established in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Justice Stewart held that the "relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[1] 443 U.S. at 319, 99 S.Ct. at 2789. The standard is *not* whether the evidence is sufficient to convince the habeas court of the petitioner's guilt beyond a reasonable doubt.[2] Nor does

---

1. The *Jackson* standard is to be applied to convictions obtained before the date of *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). *Pilon v. Bordenkircher*, 444 U.S. 1, 100 S.Ct. 7, 62 L.Ed.2d 1 (1979).

Prior to *Jackson v. Virginia, supra,* courts applied the "no evidence" standard of review set forth in *Thompson v. City of Louisville*, 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960).

The *Jackson* standard followed from the decision in *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), which held that due process required that there be sufficient proof, defined as evidence necessary to convince a trier of fact beyond a reasonable doubt, of every element of the offense.

2. The first sentence of the dissent illustrates the different standards used in assessing the

that standard require the prosecution to rule out every hypothesis except that of guilt beyond a reasonable doubt.[3] *Id.* at 326, 99 S.Ct. at 2793. The *Jackson* standard is to be applied "with explicit reference to the substantive elements of the criminal offense as defined by state law." *Id.* at 324 n. 16, 99 S.Ct. at 2792 n. 16. This also includes reference to state evidentiary law. *Moore v. Duckworth,* 443 U.S. 713, 99 S.Ct. 3088, 61 L.Ed.2d 865 (1979). Thus we have held in *Goldman v. Anderson,* 625 F.2d 135 (6th Cir. 1980), that it is proper for the federal habeas court to take cognizance of state evidentiary law in determining whether an element of the particular criminal offense has been proved.

### III.

Speigner's successful challenge to his second degree murder conviction in *Speigner v. Jago, supra,* inevitably invites comparison with this case. A divided panel of our court found that the proof in Speigner's trial[4] was constitutionally insufficient to support his conviction and upheld the district court's grant of habeas corpus relief. Each judge on the panel viewed the evidence and the applicable legal standard for reviewing it somewhat differently. Judge Peck, accurately anticipating the Supreme Court's decision in *Jackson v. Virginia, supra,* held that although there was "some" evidence in Speigner's guilt, the evidence was insufficient to support a finding of

guilt beyond a reasonable doubt under a broader reading of the "no evidence" standard of *Thompson v. City of Louisville,* 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960). Chief Judge Edwards also found the evidence to be insufficient to support a conviction. Applying the traditional interpretation of the *Thompson* "no evidence" standard, he found the record devoid of any evidence that Speigner (1) fired either of the fatal shots, (2) was ever on the scene of the murder, or (3) participated in any way in the killing. Judge Weick dissented. He argued that *stare decisis* required a restrictive view of *Thompson.* Applying the "no evidence" test, he found sufficient evidence to support the conviction.

The district court in this case found that the differences between the two trials were not material. It found that the additional element of Scott's testimony and explanations of the events which transpired on the night of the murder, relied upon by the state as providing the essential difference, did not sufficiently link Scott to the murder. Therefore, the district judge concluded:

> The evidence presented against petitioner is lacking with respect to at least three elements of the crime of second degree murder. First, there is no proof petitioner participated in any way with the murder. Second, there is no evidence to establish whether petitioner was at the

---

evidence. The dissent observes that "[b]ecause Scott's conviction for second degree murder is not supported by proof of guilt beyond a reasonable doubt, I believe he is incarcerated for life in violation of the United States Constitution." That is not the standard which *Jackson v. Virginia, supra,* specifically imposes upon a federal court in its review of the sufficiency of the evidence in a state conviction:

> But this inquiry does not require a court to "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." *Woodby v. INS,* 385 U.S. [276] at 282 [87 S.Ct. 483 at 486, 17 L.Ed.2d 362] (emphasis added). Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

443 U.S. at 318–19, 99 S.Ct. at 2789. The standard does not permit a court to "make its own subjective determination of guilt or innocence." 443 U.S. at 319 n. 13, 99 S.Ct. at 2790 n. 13.

3. Ohio apparently continues to follow the rule that where "circumstantial evidence alone is relied upon to prove an element essential to a finding of guilt, it must be consistent only with the theory of guilt and irreconcilable with any reasonable theory of innocence." *State v. Kulig,* 37 Ohio St.2d 157, 309 N.E.2d 897, 899 (1974).

4. The proof adduced in *Speigner's* case is summarized in *Speigner v. Jago,* 603 F.2d 1208, 1209–10, 1223–24 (6th Cir. 1979), *cert. denied,* 444 U.S. 1076, 100 S.Ct. 1023, 62 L.Ed.2d 758 (1980).

scene of the crime. Third, there is no evidence that the shotgun found in the victim's car was the gun used in the murder.

We disagree. We cannot simply compare the incremental evidence in this case with that found to be insufficient in *Speigner v. Jago, supra.* Rather, the *Jackson* standard requires us to consider *all* of the evidence before Scott's jury and to consider *all* inferences in the light most favorable to the prosecution. *Jackson v. Virginia, supra,* 443 U.S. at 319, 99 S.Ct. at 2789. We must make an independent analysis.[5] Contrary to the conclusion of the district judge, we believe there is a significant difference between the two trials and that the incremental quantum of evidence in Scott's case compels a different result.

### IV.

▪ As the district judge correctly pointed out, "[t]he elements of second degree murder, under former Ohio Revised Code § 2901.05, are established when the prosecution proves that the defendant purposely and maliciously killed another." Ohio law makes no distinction in culpability between the direct perpetrator of the killing (principal of the first degree) and one who aids and abets another in the commission of the offenses (principal of the second degree). The current statute provides that no person shall aid or abet another in committing the offense and that:

> Whoever violates this section is guilty of complicity in the commission of an offense, and shall be prosecuted and punished as if he were a principal offender. A charge of complicity may be stated in terms of this section, or in terms of the principal offense.

Ohio Rev. Code Ann. § 2923.03 (Baldwin). Thus, Scott could be convicted if he was found to be a principal or an aider and abettor to the murder. Moreover, the evidence is not insufficient under Ohio law because there is no evidence from which a jury could determine whether it was Scott or Speigner who fired the shots that killed William Bell. *State v. Bell,* 48 Ohio St.2d 270, 358 N.E.2d 556 (1976), *modified,* 438 U.S. 637, 98 S.Ct. 2977, 57 L.Ed.2d 1010 (1978).[6] We note that the mode of analysis for assessing the sufficiency of the evidence under *Jackson v. Virginia, supra,* is not significantly altered because this case, like *Speigner v. Jago, supra,* rests totally upon circumstantial evidence.[7]

---

5. If the two cases were the same in all respects, we would of course be required to affirm the issuance of the writ as a matter of the established law of our circuit.

6. In *State v. Bell,* 48 Ohio St.2d 270, 358 N.E.2d 556 (1976), *modified,* 438 U.S. 637, 98 S.Ct. 2977, 57 L.Ed.2d 1010 (1980), the Ohio Supreme Court noted that the evidence was sufficient to find that the appellant had assisted and acted to complete the murder. The court held that this evidence would be sufficient to sustain a finding of guilt under the aiding and abetting statute. The court continued:

   > But, in this capital case, this proposition need not be overruled solely on the above grounds. The panel was not required to accept appellant's version of the murder. As the trier of fact, it was within the province of the panel to determine which was the credible evidence. Thus, the gist of appellant's seventh proposition is that the conviction of aggravated murder was contrary to the manifest weight of the evidence. Upon review of the entire record, we hold that there was ample, credible evidence from which the panel could have concluded that appellant ac-

   tively participated in the murder. Appellant's own statement confirms his involvement in the kidnapping and the armed robbery, and concedes further that, after he drove into the cemetery, he asked Hall what was going to be done next. The court could reasonably disbelieve, as we do, that Graber lay quietly with his hands behind his head while Hall left him alone to return to his car to reload his shotgun. Evidence of bruises on Graber's body, appellant's statement to police, the physical circumstances of the slaying, and the testimony of the eyewitness Pierce all would have justified the panel's rejection of appellant's version and its conclusion that Bell either committed, *or actively assisted in, the murder.* The seventh proposition of law is therefore overruled. (Emphasis added).

   358 N.E.2d at 563.

7. Much has been written concerning the relative weight of circumstantial and direct evidence. Generalized opinion ranges from that which tends to place lesser credence in circumstantial evidence to that which assigns it greater reliability on the premise that the witness

The inconsistencies in the explanation given by Scott concerning his actions on the night William Bell was murdered are apparent. Their sequence suggests that Scott crafted their content to what he perceived to be the need when they were made. It is true that Bell's last two explanations, if believed, would support a theory that Speigner killed Bell during the time he had mysteriously dropped Scott off either at the Grape Vine Tavern or on Central. A jury could believe that Speigner alone committed the murder and dumped the body during this short interval. It might possibly have concluded that Speigner shot Bell fatally from the front and from the rear, single-handedly placed the dead weight in the car, drove to the isolated area, and pushed Bell's body onto the pavement. However, the jury had the right from its observations of Scott and the other witnesses to select which of Scott's statements, if any, were true. *Jackson v. Virginia, supra; State v. Bell, supra.* The statements Scott made on the trip from the Mahoning jail to Cleveland placed Scott, Speigner and Bell together in the car at the approximate time the murder took place. The jury could likewise have concluded, and with far more justification and reason, that Scott and Speigner formed a decision to kill Bell and either or both of them carried out the plan by shooting Bell with his own pistol, later discarded, and by shooting him in the back of the head with the sawed-off shotgun which was later found in the car in which they were stopped.[8] The jury could also

have found that Scott and Speigner took a dead or dying Bell to the vicinity of East 76th and Central Avenue where he was "dropped off" (to use Scott's phraseology), particularly since his body was found at 75th and Platt.

The jury could reasonably have disbelieved Scott's explanations that the car was rented from William Bell for $15.00. There was evidence that the car window had been broken. There was testimony by Bell's father that Bell seldom, if ever, lent his car to anybody because he needed it for his business. Moreover, the trunk contained uncashed checks and other documents which Bell required for his business, yet the car was stopped when traveling in a direction away from Cleveland.

The time of Bell's death is not precisely established, but it is placed within a time frame from which the jury could conclude that Speigner, Scott and Bell were together. The jury could conclude, based upon the broken wristwatch, that Bell had been killed at or shortly after 10:53 the night before Scott was apprehended. The blood in the back seat was not identified as belonging to Bell, but both the blood sample and Bell's blood were Type A, a type shared by only 20% of the population. The inference that the blood was Bell's becomes stronger when coupled with Scott's statement which placed all three men in the car. The stain was at a location where a person's back would normally rest; it was located precisely where a person suffering wounds

giving direct testimony may lie, but circumstances do not. *See* I Wigmore on Evidence § 26 (3rd ed. 1940). In a civil case, *Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330, 81 S.Ct. 6, 10, 5 L.Ed.2d 20 (1960), the Supreme Court stated: "But direct evidence of a fact is not required. Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." The modern view is that the law generally makes no distinction between direct or circumstantial evidence nor requires particular instruction to the jury, allowing jurors to give evidence the weight which they believe it is entitled.

8. This case is thus different from those cases cited by the dissent where the evidence demonstrated mere presence at the scene of the

crime. In each of those cases the person alleged to be a part of the crime was only a passive observer. In *Columbus v. Russell*, 39 Ohio App.2d 139, 316 N.E.2d 897 (1973), a person who was present at the time a bicycle was stolen, but who did not participate in the theft, could not be held as an aider or abettor. In *State v. Clifton*, 32 Ohio App.2d 284, 290 N.E.2d 921 (1972), a party who had entered a store with the perpetrator of an attack could not be considered to be part of a conspiracy from his mere association with the perpetrator. Here, as the recited evidence demonstrates, the jury could have concluded that the murder required for its successful accomplishment the participation of two persons, who could have been Scott and Speigner.

such as Bell's would have bled on the seat. Moreover, Bell's body had to be transported to the isolated area where it was dumped.

There is a temptation in this case to speculate on evidence which might have been offered rather than on the evidence actually placed in front of the jury. Why, for example, wasn't a particular motive shown?[9] Why weren't any of Scott's fingerprints found on Bell's vehicle? Why weren't any of Scott's fingerprints on the gun and why didn't the prosecution show that the shotgun was the weapon actually used in the murder?[10] Under *Jackson v. Virginia, supra,* the primary emphasis must always be upon that evidence which was in fact presented to the jury. When sufficient evidence is presented from which a jury can conclude guilt beyond a reasonable doubt, it is not for the appellate court to ponder why other evidence was not presented.

We recognize, of course, that once the "no evidence" rule is abandoned, the sufficiency of the evidence will always be a matter of degree. Judge Peck recognized this in *Speigner v. Jago.*[11] The explanations made by Scott add incremental weight

to the evidence and bring it within the range Judge Peck observed would support a jury's finding. The permissible inferences from the statements and testimony of Scott place Bell in his own car in the presence of both Scott and Speigner at the time of the murder, a circumstance which is altogether missing in the evidence presented in Speigner's trial.

## V.

Since the writ was based solely upon the trial court's determination of insufficient evidence, the other issues raised by Scott in his petition were not addressed. Accordingly, the judgment of the district court is reversed and the cause remanded for further proceedings consistent herewith.

MERRITT, Circuit Judge, concurring.

Despite the strong language used in Judge Jones' dissenting opinion and the accusation that the majority is "acting as grand jury, prosecutor, and state trial court," rather than as a neutral federal tribunal, I continue to adhere to my original concurrence in Judge Engel's opinion be-

**9.** It is unnecessary to show motive under Ohio law. It is sufficient that the killing be done purposely and maliciously. These elements can be inferred from the facts and circumstances surrounding a killing where a deadly weapon is used. *In re Williams,* 41 Ohio App.2d 144, 324 N.E.2d 182 (1974). The evidence does present suggestions for particular motives. One suggestion is that Scott and Speigner were determined to steal Bell's car. They could have broken into the car where an inebriated Bell was located, killed him, dumped his body, and proceeded out of town. Alternatively, the killing could have had some relation to Bell's work as a private investigator. No matter what motive is conjured up, it stretches credulity to conclude that both of the shots which killed Bell were accidently fired.

**10.** The fact that the police were unable to obtain any fingerprints of Scott on either the car or the shotgun is not conclusive. First, no prints at all were found on the shotgun although someone surely handled it. Since Scott's presence in the car is established, the lack of his fingerprints on the car merely suggests that his prints were not sufficiently clear to be lifted or that they had been wiped away.

The fact that there was no affirmative evidence that the shotgun under the seat was that

used to shoot Bell is also not conclusive. One explanation is that a different shotgun was used in the murder. There was no evidence suggesting, however, that the shotgun belonged to Bell, which would explain its presence in the car. Another explanation is that the shotgun was wiped clean after use and that a lapse in the police investigation caused the failure to examine the chamber for evidence of recent firing. The value of using a shotgun, of course, is that there is not a traceable projectile. Thus it could not be clearly established in any event that the sawed-off shotgun found in the car was the one used to murder Bell.

**11.** Judge Peck observed:

For example, if to make a case, it is necessary to prove that a defendant was in a given Cincinnati motel room at a particular time in question, testimony that he was in the State of Ohio would clearly be "no evidence" as to the critical fact. Testimony placing him in the building, however, might present a close question; while evidence that the defendant had gotten off the elevator on the particular floor of the motel within the crucial time frame would properly support a jury's finding in the fact of a constitutional challenge. *Speigner v. Jago, supra,* at 1212 n.3.

cause I continue to think that the circumstantial proof in this case is strong. The defendant was found in flight in the dead man's car within a few hours of the murder, with the sawed off shotgun which was most likely the murder weapon under the seat. Thereafter, he made three different inconsistent statements about how he came into possession of the automobile. This ought to be sufficient circumstantial evidence for a rational jury to convict under *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), if, after weighing this and all the other evidence, the jury firmly believes that the defendant is guilty of the murder beyond a reasonable doubt.

NATHANIEL R. JONES, Circuit Judge, dissenting.

Because Scott's conviction for second degree murder is not supported by proof of guilt beyond a reasonable doubt, I believe he is incarcerated for life in violation of the United States Constitution. I reach this conclusion from my review of the record and the teaching of *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Consequently, I dissent from my brethren's reversal of the district court's issuance of a writ of habeas corpus.

## I.

The sole issue before our Court is whether after reviewing the evidence undergirding Scott's conviction for second degree murder in the light most favorable to the prosecution, we can conclude that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Our inquiry is governed by the holding of the Ohio court of appeals, as reflected in their journal entry:

> The trial judge correctly instructed the jury that in order to reach a verdict of guilty of murder in the first degree it must conclude, beyond a reasonable doubt, that: (1) [the decedent] was a living person ... who had been killed by [Scott]; (2) that the killing was done purposely.          •

> A careful review of the record demonstrates that there was a sufficient amount of *probative evidence presented to the jury to enable it to find beyond a reasonable doubt that [Scott] purposely ... killed the [decedent] ....* At the same time the record reveals no evidence, circumstantial or otherwise, from which it could be concluded or inferred that the killing was ... premeditated.

> Accordingly we ... find [Scott] guilty of murder in the second degree and order that [Scott] be imprisoned for life.

Joint App. 30 (emphasis added). Thus, the Ohio court of appeals held that Scott *purposely killed* the decedent. Unfortunately, the majority opinion inexplicably fails to answer the only question presented to us: whether there is proof from which a rational trier of fact could find each element of the offense beyond a reasonable doubt. Rather, the majority, acting as grand jury, prosecutor, and state trial court, posits that Scott's conviction for second degree murder is supported by proof that he "aided and abetted" the murder of the decedent. Though under Ohio law a charge of aiding and abetting may be stated in terms of the principal offense, O.R.C. § 2923.03(F) (Baldwin's 1979), there is no evidence that Scott had actual notice in his indictment of a charge of aiding and abetting. Nor is there evidence that the jury was instructed on that charge. It is clear, however, that Scott was *not* convicted in state court of aiding and abetting. Nor did the state appeals court affirm on that basis. Rather, it found him guilty of a lesser charge. Fundamental due process rights to notice of charges and the opportunity to defend oneself restrain the state's ability to deprive its citizens of their liberty. Absent an indictment, prosecution, jury instructions and conviction in a state court for aiding and abetting, Scott's due process rights have been abrogated by the majority. His petition for habeas corpus challenges the only offense of which he was convicted by the Ohio court of appeals, purposely killing the decedent.

## II.

In any event, I would hold that Scott's conviction for second degree murder is not supported by proof of guilt beyond a reasonable doubt, for no rational trier of fact could have found that the essential elements of the crime of murder were shown. The majority opinion recites in extended detail facts of record. Nowhere does that recital refer to facts in support of the elements of the crime for which he was convicted. The silence of the record on that score apparently led the majority to seek justification on grounds of aiding and abetting.

In support of its conclusion that the evidence is sufficient to convict Scott for the murder of the decedent, the majority concludes that "the statement Scott made on the trip from Mahoning jail to Cleveland placed Scott, [his co-defendant and the decedent] together in the car at the approximate time the murder took place." Scott's three inconsistent statements concerning his whereabouts the evening of decedent's death are relevant evidence from which a jury can infer no more than that Scott was in the decedent's car on the evening of his death.

Additionally, the majority notes that expert testimony estimated the time of decedent's death as between 11:00 p. m. and 2:00 a. m., and as late as 3:30 a. m. Thus, the state proved that Scott was present with the decedent during the four hours in which he was short and had the opportunity to perpetrate the crime. Proof of Scott's presence in the car (not at the scene) and his opportunity to perpetrate the crime are the only inferences in the state's favor that the evidence will rationally support. Under Ohio law, it is a fundamental principle that even the presence at the scene of a crime, standing alone, never suffices to prove guilt beyond a reasonable doubt. The law of Ohio is clear that "the mere presence of an accused at the scene of a crime and the fact that he was acquainted with the perpetrator is not sufficient proof, in and of itself, that he was an "aider and abettor." *Columbus v. Russell*, 39 Ohio App.2d 139, 316 N.E.2d 897 (1973). "The mere association of one who perpetrates an unlawful act does not render a person *particaps crimmes* (a participant in the crime) so long as his acts are innocent." *State v. Clifton*, 32 Ohio App.2d 284, 290 N.E.2d 921 (1972). These principles are embodied in the concept of constitutional due process articulated in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 307, 61 L.Ed.2d 560 (1979), and *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).

Perhaps in recognition of the fundamental constitutional principle that Scott's mere presence at the scene and opportunity to perpetrate the crime is not proof necessary for conviction, the majority also holds:

> The jury could likewise have concluded, with far more justification and reason, that Scott and [his co-defendant] formed a decision to kill [the decedent] and either or both of them carried out the plan by shooting him with his own pistol, later discarded, and by shooting him in the back of the head with a sawed-off shotgun which was later found in the car in which they were stopped. The jury could also have found that Scott, and [his co-defendant] took a dead or dying [body] to the vicinity of East 76th and Central Avenue where he was "dropped off" . . . particularly since his body was found at 75th and Platt.

However, such a conclusion, to be "justified and reasonable," must be predicated upon evidence. Significantly, the majority points to no evidence from which the jury may infer that Scott formed a decision to kill the decedent. Nor was there any evidence that the shotgun under the front seat of the defendant's car in which Scott was stopped at 5:30 a. m. was used in the commission of the crime. The majority cautions against the temptation to "speculate on evidence which might have been offered rather than on that evidence actually placed in front of the jury." Yet in discussing "theories" which the jury may have accepted, the majority engages in plain speculation. Speculation is contrary to the Supreme Court's admonition in *In re Winship, supra*, at 364, 90 S.Ct. at 1072:

438

Due process commands that no man shall lose his liberty unless the government has borne the burden of . . . convincing the factfinder of his guilt.

It is critical that the moral force of the criminal law not be diluted by a standard of proof that leaves people in doubt whether innocent men are being condemned. It is also important in our free society that every individual going about his ordinary affairs have confidence that his government cannot adjudge him guilty of a criminal offense without convincing a proper factfinder of his guilt with utmost certainty.

A full distillation of the majority's reasoning and explication leaves us with nothing more than conjecture, suppositions and speculation as to what may or may not have motivated the jury to convict. None of this adds up to or is a substitute for proof, nor does it give rise to inferences supportive of guilt. The evidentiary gap remains and the requirements in *Jackson v. Virginia* are thus unmet. The only conceivable way a trier of fact in Ohio could find guilt is to pyramid an inference atop an inference. This is impermissible in Ohio.

The majority places great stress on the various inconsistencies in Scott's explanations of his movements on the night the victim was murdered. It is this series of contradictions as well as the Ohio statute of aiding and abetting and complicity which lead the majority to distinguish *Speigner v. Jago,* 603 F.2d 1208 (6th Cir. 1979), *cert. denied,* 444 U.S. 1076, 100 S.Ct. 1023, 62 L.Ed.2d 758 (1980).

I turn again to the question of the inconsistent statements and reiterate my view that the inconsistencies in Scott's explanations amount to nothing more than a credibility deficit.

I am deeply troubled by the majority resting its holding on such a nebulous and improper basis as "their sequence [Scott's inconsistencies] *suggest* that Scott crafted their content to what he perceived to be the need when they were made," (emphasis added), as though it is substantive proof of murder. Such a suggestion regarding inconsistencies, I submit, is not proof in Ohio.

The *Speigner* majority contended not only with the fact of a falsehood, but also with the fact of Speigner's flight and fugitive status for a period of nearly a year. Even so, this Court in *Speigner* recognized that these events and the inferences to be drawn therefrom did not fill the evidentiary gap necessary to meet the charge of murder in the second degree. Judge Peck observed:

In addition to the evidence previously considered in the text, the record below contains evidence that petitioner cooperated with the driver Scott in giving a false rental story and that petitioner evaded the Cleveland police for some ten months after his June 26, 1973 release. Although these facts may tend to prove that petitioner committed some crime they do not tend to prove that petitioner committed the crime of second degree murder.

Similarly, the fact that petitioner Scott gave varying explanations of acquaintance with the victim and presence in the victim's automobile and events during the hours preceding his arrest, as did Speigner, would not support a conviction for second degree murder.

In this case, the fundamental protection of due process of law necessitates an affirmance of the district court because no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia, supra,* 443 U.S. at 319, 99 S.Ct. at 2789.

Though it is with great reluctance that any federal court intrudes upon the finality of a state criminal conviction, this Circuit is in all likelihood the final arbiter between Scott's guarantee to fundamental due process of law and Ohio's interest to make someone pay for the killing of the decedent. Absent proof of Scott's guilt beyond a reasonable doubt, our Court must not be the trough from which Ohio satisfies its thirst to avenge a brutal killing. I dissent.