**Timothy C. TIPTON,
Petitioner-Appellant,**

v.

**Arnold R. JAGO, Respondent-Appellee.**

**Richard R. FARR, Petitioner-Appellant,**

v.

**Eric MUSEKAMP, Respondent-Appellee.**

No. 86–3657.

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 13, 1987.

Decided May 13, 1987.

Rehearing and Rehearing En Banc
Denied July 1, 1987.

Richard R. Farr, Cincinnati, Ohio, pro se.

Firooz T. Namei (argued) Cincinnati, Ohio, for Tipton.

Beverly Yale (argued), Asst. Atty. Gen., Columbus, Ohio, for respondent-appellee.

Before MARTIN, NELSON and BOGGS, Circuit Judges.

BOGGS, Circuit Judge.

In a consolidated case, two habeas corpus petitions were dismissed by the United States District Court for the Southern District of Ohio. The petitioners appeal, asserting that their convictions for robbery were invalid because of insufficient evidence, reasonable mistake of fact, and other reasons.

We hold that there was no evidence to support an essential element of the offenses charged. We reverse the district court and remand with instructions that the writ issue.

**I**

In April 1983, a former client telephoned Richard R. Farr, a practicing lawyer in Cincinnati, to ask him to represent Ralph Tuccinardi, then incarcerated in the Cincinnati City Jail. Farr visited Tuccinardi the next day, advised him to plead "no contest" to the theft charges, and agreed to represent him at arraignment. Farr asked for no retainer, but later testified at the trial that he set a fee of $200 for representation at the arraignment.[1] At arraignment the following day, the judge accepted the no contest plea and found Tuccinardi guilty, but sentenced him to "time served," and freed him.

After Tuccinardi was released, Farr approached him more than once at his residence and also telephoned him in attempts to collect his fee. Tuccinardi changed addresses and failed to notify Farr. Later, Tuccinardi resurfaced at the Forest Pony Keg in Cincinnati, where he worked, and lived in the apartment over the store. The Pony Keg did not have a telephone, so Farr visited Tuccinardi there to demand payment, when he learned of Tuccinardi's whereabouts. Tuccinardi told Farr to return another day when he would be able to pay Farr out of his paycheck.

At this point in the testimony at trial, Farr's version of the facts and Tuccinardi's version diverge. Farr testified that the appointed day for his return to the Pony Keg was the next Sunday; Tuccinardi testified that it was Monday. Tuccinardi testified at trial that he was in fact paid on every Friday, but he also testified with respect to the appointed date for payment to Farr that there was no reason that he would have been willing or able to pay on another day.

On Sunday, July 3, 1983, Farr was in the company of his friends Michael Dulay, Doris Nock and Timothy Tipton, at the Coney Island public swimming pool. After leaving the swimming pool in Farr's automobile, Farr announced that he was going to visit the Pony Keg to collect a legal fee

---

1. Tuccinardi denied the existence of a set fee at trial, but he did not deny acknowledging in his later contacts with Farr that the fee was $200.

from a client. At the Pony Keg, Farr parked the automobile and went inside, followed by Dulay and Tipton. The latter individuals merely intended to buy beer. Miss Nock waited in the automobile.

Once inside the Pony Keg, the three individuals approached Tuccinardi, who was standing behind the counter. Farr asked Tuccinardi for the $200 and was rebuffed. Tuccinardi replied that he did not have the money, but told Farr that he would pay him the next Monday. Farr replied, somewhat heatedly, that he needed the money immediately. Tipton, who was across the counter from Tuccinardi but within striking distance, threatened to "tear up the store" and to take Tuccinardi forcibly into the parking lot and "whoop him." Tipton then initiated a nonconsensual physical contact with Tuccinardi, which was described variously in the testimony. Tipton called it a "touching" of the chin; Tuccinardi and Farr both described it as a "grabbing" of the chin. In any event, it lasted for only about a second. The witnesses also disagreed whether Dulay or Tuccinardi pushed Tipton's hand away from Tuccinardi.

Tuccinardi then took $50 out of the cash register and handed it to Farr, who had done nothing to help or hinder Tipton's actions toward Tuccinardi. Farr wrote out a receipt, which Tuccinardi signed and gave back to Farr. At the trial, Tuccinardi testified that the copy of the receipt that was admitted into evidence was not the same one that he had signed. Furthermore, Tuccinardi testified that he signed the receipt under duress; and that he would not have given Farr the money except for the threats and force that Tipton used. Farr testified that he neither asked Tipton to use force and threats nor sought his assistance in collecting the debt.

After this incident at the Pony Keg, the four friends departed for Farr's apartment in the automobile. Tuccinardi asked a clerk at the Pony Keg to summon the police. Officers Lemker and Hood were dispatched to the Pony Keg, and later apprehended Tipton at Farr's apartment. Farr and Tipton explained their actions to the officers at that time. After the officers transported Tipton to the police station for booking, Farr went there to represent Tipton. Officers Wells and Stratton interviewed Farr at the station, after he waived his rights, and arrested him at that time.

The grand jury indicted Tipton and Farr separately and the cases were consolidated for a bench trial. At the trial, the State produced as witnesses the police officers and Tuccinardi, who was the State's only witness to the actual offense. Tipton and Farr were found guilty of robbery, and sentenced to three to fifteen years in prison and four to fifteen years in prison and a $500 fine, respectively.

Farr received two years probation in lieu of his sentence. Tipton could not make bail until April 19, 1984, and was imprisoned after the trial until that time. The Ohio Court of Appeals affirmed the trial court in a *per curiam* opinion. Both appellants sought review in the Supreme Court of Ohio on the grounds that Farr's motive to collect his legal fee negated the intent to rob. The Supreme Court of Ohio denied review.

Tipton moved for reduction of his sentence in the Common Pleas Court. The court denied this motion. Farr moved for reconsideration before the Supreme Court of Ohio, which was denied. The Board of Commissioners on Grievance and Discipline of the Ohio State Bar Association reviewed the trial record and found "no evidence to support the conviction" in a "[review] of the entire transcript of the criminal proceedings against [Farr]," but the Board felt constrained by the Rules for the Government of the Bar to recommend Farr's indefinite suspension. Pursuant to the Board's recommendation, the Supreme Court of Ohio suspended Farr from the practice of law on January 15, 1986.

On January 3, 1986, twenty-one days before the termination of his probation period, Farr filed a *pro se* petition for habeas corpus in the United States District Court for the Southern District of Ohio. Through counsel, Tipton filed a similar petition on January 10, 1986. The cases were referred to a United States magistrate, who filed a report of his findings of fact

with the court. The magistrate's report stated that the only issue was the possibility that a rational trier of fact could have found each element of the robbery beyond a reasonable doubt. The magistrate rejected appellants' argument that *State v. Snowden*, 7 Ohio App.3d 358, 455 N.E.2d 1058 (1982), held that they could not have had the specific intent to rob if their motive was to collect a debt.

Appellants objected to the magistrate's report on the grounds that the magistrate misapplied the intent requirement of the crime, and the complicity requirement. After *de novo* review of the objections, the district court dismissed the petitions. The court held that *Snowden* meant only that the presence of a legally owed debt *could* negate the *mens rea* element of robbery, but that it *need* not. The court below assumed that the trial court had concluded that appellants did not act with intent to collect a debt.

## II

Appellants were charged with violation of Ohio Revised Code § 2911.02 (Page 1982) defining robbery to include "committing a theft offense" while "use[ing] or threaten[ing] the immediate use of force against another." While the evidence of Tipton's threats and use of force are quite weak, we cannot say that no rational trier

of fact could have found the element of force.

As defined in Ohio Revised Code § 2913.-02, theft involves the following elements: (1) "purpose to deprive the owner of property"; and (2) "without the consent" or "beyond the scope of the express or implied consent" of "the owner or person authorized to give consent."

The offense here was charged in the language of the statute; that is, appellants were "committing or attempting to commit a theft offense, to wit: theft of United States currency." The State in its opening argument specifically stated: "The money belonged to the Forest Pony Keg, not to Mr. Tuccinardi." Thus, the relevant elements that must be assessed do not involve depriving Tuccinardi of money. They involve depriving the owner of the Pony Keg, even though he never made any complaint.

Thus, there must have been a specific intent not merely to get money from Tuccinardi (whether or not justified in doing so), but to take money from the Pony Keg.[2] There was no evidence whatsoever that Tuccinardi ever said he was giving them the owner's money, or that by any act or statement the defendants indicated a desire or intent to take the owner's money.

The State argues that the mere fact that Tuccinardi took the money from the cash register is evidence from which the judge could have inferred both a knowledge of

---

**2.** If the charge is considered as directed at depriving Tuccinardi of his own property, the *Snowden* case would become extremely relevant. In *Snowden* and similar cases (*see, e.g.,* Annotation, *Robbery, Attempted Robbery, or Assault to Commit Robbery as Affected by Intent to Collect or Secure Debt or Claim,* 88 ALR 3d 1309 (1978)), overbearing debt collection has generally been held not to provide a defense whenever there are indicia that more is involved than simple debt collection, such as taking more than the amount due, taking without acknowledgement, or taking in the face of explicit resistance. Certainly, the existence of a legitimate debt does not justify a breach of the peace in debt collection. Cf. Ohio Revised Code § 1309.46 (Page 1979). On the other hand, debt collection has been adjudicated a complete defense to robbery where the cry of theft is raised only after the fact, where the consensual nature of the delivery of money is not in dispute, and in general where the circumstances surrounding the debt

collection are such as to negate the intent element of the crime.

Here, even were it assumed that the taking of Tuccinardi's money was involved, the doctrine of *Snowden* might provide a defense. There the court held that an accused does not act with purpose to deprive an owner of property if he reasonably believes that he has a right to the property in question. 455 N.E.2d at 1065. Here, the evidence is strongly to the effect that Farr wanted only the money owed him. Indeed, he departed with only 25% of that amount, even though there was more in the drawer. Further, persons taking money with the purpose of depriving another of his property normally do not give signed receipts. We do not believe, however, that it is the intent with regard to Tuccinardi's money that is relevant here. The State did not contend that Tuccinardi's money was involved, or that appellants' intent with regard to money of Tuccinardi supported the crime.

the ultimate source of the money and the intent to take money, knowing it to be the owner's. We disagree, believing that this piles inference upon inference to the breaking point. As indicated in Ohio Revised Code §§ 2913.02 and 2901.22(A), the intent that matters here is the specific intent to deprive the owner of the Pony Keg of his money. There is simply no evidence for that proposition. All of the evidence is that the defendants intended to collect the legal fee from Tuccinardi. There is not the slightest indication that they were bent on obtaining money, regardless of the source. It is true that Tuccinardi pleaded poverty; however, the intermingled nature of cashier and store owner, especially in this small establishment, with the cashier living over the store, are such that it is simply not reasonable to permit stretching the inference to the point that Tuccinardi's making the payment from the cash register can be used to supply the crucial element of intent to rob the owner.

This argument is further supported by a careful examination of the definition of purpose, the key element under consideration. Ohio Revised Code § 2901.22(A) (Page 1982) states:

> A person acts purposely when it is his intention to cause a certain result, or when the gist of the offense is a prohibition against conduct of a certain nature regardless of what the offender intended to accomplish thereby, it is his specific intention to engage in conduct of that nature.

The provisions of the Criminal Code are penal in nature, and must be "strictly construed against the State and liberally construed in favor of the accused." Ohio Revised Code § 2901.04(A). In the light of this rule of statutory construction, Farr's visit to the Pony Keg was not "purposely" or "with purpose" to rob the Pony Keg, because it was not his intention to cause the result of depriving the owner of his money. *See* Ohio Revised Code § 2913.02.

The convictions are REVERSED, because no rational trier of fact could have found Farr and Tipton guilty of each essential element of the crime of robbery. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Scott v. Perini*, 662 F.2d 428, *cert. denied*, 456 U.S. 909, 102 S.Ct. 1758, 72 L.Ed.2d 167 (1981).

DAVID A. NELSON, Circuit Judge, dissenting.

I regret that I cannot concur in the court's conclusion that there was no evidence that the petitioners intended to deprive the Forest Pony Keg's owner of his fifty dollars.

Notwithstanding "the intermingled nature" of Mr. Tuccinardi and his employer,[1] Petitioner Farr, who testified in his own behalf at the robbery trial, did not assert that he thought the money belonged to anyone other than the owner of the store. Petitioners' counsel made no such claim either, and I find nothing in the record to suggest that the petitioners supposed Mr. Tuccinardi kept his own money in the store's cash register.

The record shows that Petitioner Farr, at least, knew that Mr. Tuccinardi was not self-employed. At the very outset of the robbery trial Mr. Farr's lawyer told the court that when Mr. Farr first spoke with Mr. Tuccinardi in the pony keg, "Mr. Tuccinardi told Mr. Farr, 'Come back Sunday. *My boss will be back in town* ... and I'll have the money for you.'" (Emphasis supplied.) On cross-examination Mr. Tuccinardi confirmed that he had told Mr. Farr "I get paid on Fridays." That was not the testimony, obviously, of someone who was self-employed—and Mr. Farr himself testified "I was not acquainted with the owner of the pony keg." Mr. Farr *was* acquainted with Mr. Tuccinardi, a sometime client, and knew that Mr. Tuccinardi was a "deadbeat," not a man of property.

Mr. Farr conceded, on cross-examination, that he had no knowledge of Tuccinardi

---

**1.** About all that was really intermingled, as far as the record discloses, was Mr. Tuccinardi's habitat and his workplace. Mr. Tuccinardi testified that he occupied a basement apartment in the beverage store, or "pony keg," where he was employed, but the reader ought not infer that Mr. Tuccinardi and his employer were Siamese twins, or even abnormally intimate friends.

having any proprietary interest in the pony keg. All Mr. Farr knew was what he had been told by a mutual acquaintance; namely, that Mr. Tuccinardi was working and living at the pony keg, "and that he was making enough money that he ought to be able to pay me off within a reasonable time." Mr. Tuccinardi testified, without contradiction, that in fact he had no ownership interest in the Forest Pony Keg and was not the owner of the fifty dollars taken from the cash register. There is not a scintilla of evidence to suggest that the petitioners thought otherwise, or to indicate that they believed the store's owner had authorized Mr. Tuccinardi to dip into the till for his own purposes.

Although Mr. Tuccinardi claimed that Mr. Farr had been told to come in for his money on Monday, July 4, it would have been reasonable for the state trial judge to accept Mr. Farr's testimony that Tuccinardi had told him to come in on Sunday, July 3. When Mr. Farr did so—accompanied, this time, by two other men—Mr. Tuccinardi tried to pretend that the Fourth was the appointed day. In fact, as Mr. Farr may be presumed to have divined, Tuccinardi had no intention of paying the debt at all. Under the circumstances, it would hardly have been surprising for Mr. Farr to lose his temper—and that seems to be precisely what happened. "I got very angry with him" when Tuccinardi said he did not have the money, Mr. Farr testified, and "there was a lot of name-calling." The record indicates that Petitioner Tipton, one of the men Mr. Farr had brought with him,[2] "got very heated," grabbed Mr. Tuccinardi by the chin or around the neck, and threatened both to tear up the store and to take Mr. Tuccinardi out in the parking lot and "whoop" him. After Petitioner Tipton's hand had been "slapped away" by the third man in the trio, as Mr. Farr testified, Tuccinardi said "Well, I'll pay you fifty dollars"; he then turned to the cash register, took out the money, and gave it to Mr. Farr. If there is no reason to suppose that Mr. Farr intended to take the store owner's money before it was offered to him, neither is there any reason to suppose he intended to reject the offer when he accepted it.

Mr. Tuccinardi said he did not need a receipt, but Mr. Farr, as he testified, "wanted a written acknowledgment of how much [Tuccinardi] still owed me." Mr. Farr got a piece of paper and wrote the date on it, followed by the words "Received of Ralph Tuccinardi $50. Balance due: $150." Mr. Farr then signed his name and insisted that Mr. Tuccinardi do likewise. There is no dispute about the fact that Mr. Tuccinardi did sign the paper—"under duress," as he claimed—and there is no dispute that Mr. Farr took this acknowledgment of indebtedness away with him. He did not offer to give Mr. Tuccinardi a copy, nor did Tuccinardi request one.

Mr. Tuccinardi had a fellow employee call the police when the men left the store, and two police officers responded promptly. Tuccinardi told the officers where Mr. Farr lived. The officers went to Mr. Farr's house and found him and Mr. Tipton there. A computer check disclosed "some capiases" on Petitioner Tipton; he was arrested and taken to the police station. Asked at this time "Why did you grab Mr. Tuccinardi around the neck?" Mr. Tipton replied, according to the officer, "I was just trying to help out a friend."

After declining to say anything further without his attorney being present, Mr. Tipton telephoned Mr. Farr and asked him to come to the station. A police officer testified that he then got on the line and told Mr. Farr "We want to talk to you also in reference to this incident." Mr. Farr went to the police station, was advised of his rights, and in the course of the ensuing conversation told the police that Mr. Tipton had "grabbed" Mr. Tuccinardi. "[T]his," Mr. Farr was quoted as saying, "is the only way I can collect from a deadbeat." When asked "Couldn't you go to civil court?" Mr. Farr replied, according to the police officer, "sometimes that's too slow ... I don't have the time."

Having reviewed the record of the bench trial at which the petitioners were convict-

---

**2.** Mr. Farr's girlfriend, who remained outside in the car, testified she "thought that [the men who went in with Mr. Farr] were going in to buy beer," but it turned out they bought nothing; what their intention may actually have been is anyone's guess.

ed, Judge Spiegel, the United States District Judge who denied the petitions for habeas corpus, concluded that "a rational trier of fact could have found the element of intent present in this case" and could rationally have found the petitioners "either guilty or not guilty." Judge Spiegel, in my view, was right.

It is true that the crime—if it was a crime—was not a particularly heinous one, and the consequences of the conviction were severe; Mr. Tipton has spent a substantial period of time in prison, and although Mr. Farr has not suffered that indignity, the felony conviction led to the loss of his license to practice law. Judges can readily sympathize with someone like Mr. Farr, a certified member of "the company of educated men and women," and the temptation to be magnanimous here is hard to resist. As Judge Spiegel's decision correctly intimates, however, our role is a very limited one—and regardless of how we might have preferred to see the case decided at the criminal trial level, our sympathies ought to be immaterial if the trial record contains evidence on which a rational fact-finder could have concluded that the petitioners were guilty. We are not a court of first instance, and we are not even an Ohio court of error; our sole function is to determine whether the robbery convictions violated the Due Process Clause of the United States Constitution. I can discern no such constitutional violation.

If Mr. Tuccinardi had been a teller in a bank or a cashier in a supermarket, and if he had been confronted at his place of employment by someone threatening to "tear up" the place if he did not immediately make payment on a personal debt, surely it would have been no defense to a charge of robbery that the debt collector did not care whether the debtor paid with his own money or his employer's. That being so, I am not prepared to say that the debt collector has a constitutionally mandated defense if the debtor happens to occupy living quarters somewhere on the premises where he works. If Mr. Tuccinardi had been a live-in domestic servant—a handyman or gardner occupying quarters at his employer's home, for example—I do not see why, as a matter of law, the accident of his residence would have justified a taking of the employer's property. The facts of this case (which none of us can interpret with the authority of a trial judge who actually heard the testimony, of course) do not strike me as sufficiently different from those hypothesized to justify the conclusion that the State of Ohio violated the Federal Constitution in convicting Messrs. Farr and Tipton of robbery.[3] I would have affirmed the denial of the writs.

---

**3.** I attach no significance to the fact that the complaints by which the criminal proceedings were initiated were signed by Mr. Tuccinardi, the man on the scene, rather than by his employer, of whose whereabouts we know nothing. It was Mr. Tuccinardi who sent for the police, and it was the police, according to their testimony at the probable cause hearing that resulted in Mr. Farr's being bound over for the grand jury, who took Mr. Tuccinardi to the police station to sign the complaints. There was no reason for Mr. O'Neil, the owner of the pony keg, to sign a complaint after Mr. Tuccinardi had already done so, and it is not inconceivable that Mr. O'Neil (who was said to have owed Mr. Tuccinardi an indeterminate amount for ten days of work performed over the preceeding two or three weeks) could recoup his loss in any event by deducting fifty dollars from Mr. Tuccinardi's pay. No such recoupment could turn a robbery into a loan after the fact, however.