James Lafayette **BRONSTON,**
Petitioner-Appellant,

v.

John D. **REES,** Respondent-Appellee.

No. 85–5090.

United States Court of Appeals,
Sixth Circuit.

Argued Aug. 26, 1985.
Decided Oct. 4, 1985.

---

Robert L. Tucker, Acting Federal Public Defender, Nashville, Tenn., Henry Martin (argued), for petitioner-appellant.

Christopher W. Johnson, Frankfort, Ky., John Gillig (argued), for respondent-appellee.

Before MERRITT and WELLFORD, Circuit Judges; and CELEBREZZE, Senior Circuit Judge.

MERRITT, Circuit Judge.

This habeas corpus appeal presents the sole issue of whether defendant's conviction for armed assault and malicious shooting and wounding was supported by sufficient evidence under the standard of *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), which requires that, based on the evidence, any rational trier of fact could have found all of the essential elements of the crime beyond a reasonable doubt. The defendant was convicted and sentenced to concurrent terms of life imprisonment and twenty-one years in 1968. He was paroled in 1983.

This is the second time this case has been before the Court. On the first appeal, the Court primarily addressed the issue of whether the petition was frivolous. After holding that it was not, due to an intervening change in the law between defendant's second and third habeas petitions,[1] the Court also reviewed the summary of evidence presented in the Kentucky Court of Appeals' decision and concluded that "petitioner has raised a difficult and serious question as to whether there is sufficient evidence upon which to base his conviction." *Bronston v. Rees*, 740 F.2d 967 (6th Cir.1984). This Court then remanded the case with instructions that the actual transcripts of defendant's trial be filed; the District Court was instructed to review the evidentiary record and apply the *Jackson* standard.

The District Court reviewed the transcripts and denied the writ. Thus, the case is once again before the Court, which faces the same sufficiency of evidence question that it earlier expressed as presenting a "difficult and serious question" based on the facts then before the Court. Although this case presents a very close issue, we hold that defendant's conviction is supported by substantial evidence. We, therefore, affirm the judgment of the District Court.

**I.**

Defendant and the government agree that the only facts adduced at trial concerning defendant's alleged involvement in the armed assault of a Lexington businesswoman were: (1) that Bronston had left the house of co-defendant Bush in the company of Bush and co-defendant Smith approximately 1½ to 2 hours before the crime occurred, after co-defendant Bush had instructed his girlfriend to make him a white mask and had then told her, "We are going to make some money" and that the businesswoman "keeps money all the time"; (2) that the next day defendant had come to Bush's house to inform him that the police had arrested Smith, to which Bush responded, "Well, Harry didn't do the shooting, I done the shooting"; and (3) that Bronston testified at trial that he had not been with his co-defendants at all on the evening of the crime, an assertion that was convincingly refuted. These three facts are admittedly the only facts concerning Bronston from which the jurors rationally could have inferred guilt. The defendant argues that this evidence is not sufficient for a rational inference of guilt beyond a reasonable doubt.

The basic facts are those as set forth by the Kentucky Court of Appeals:

The facts of the crime are as follows: On Friday, February 16, 1968, Mrs. Mary Faulkner, a sixty-nine-year-old business

---

1. Defendant's first habeas petition, filed on the basis of illegal arrest, prosecutorial misconduct, and ineffective assistance of counsel, was denied in December 1973. His second petition was denied in August 1974 under the old "no evidence" standard of *Thompson v. City of Louisville*, 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960). This is his third petition.

woman of Lexington, returned home from her business between 9:00 and 9:30 p.m. As she was getting out of the car in her garage in a well-lighted area, she was confronted by two assailants wearing white masks and white hats. Mrs. Faulkner took a gun from her purse and fired at the masked men. She did not hit either. They returned her fire and she received three bullet wounds, as a result of which she was hospitalized for ten days. The crime was witnessed by Mr. Hayden, a young man who lived at the Faulkner home. Neither Mrs. Faulkner nor Mr. Hayden could identify the men, nor could they say whether they were white or Negro.

Thomas A. Fitzpatrick is a police officer for the city of Lexington. He was off duty on February 16, 1968. Somewhere between 9:00 and 9:30 he was driving on Walnut Street at the intersection of Main, with his wife, when he observed a red Pontiac convertible with a black top and Indiana license plates. He turned east on Main and so did the convertible. The convertible began to cut in and out of traffic at a high rate of speed. When the cars reached Walton Avenue on Main Street, Fitzpatrick pulled up beside the convertible to get a look at the driver. He recognized Harry Smith, who had two male companions in the car with him. He did not recognize Smith's companions. Because of the lighting at the intersection, he was not able to see them very well, however, he did notice they had on white hats. Smith did not have on a hat at the time. The convertible proceeded on and went out Tates Creek Road. Officer Fitzpatrick obtained the license number and wrote it in his notebook.

Fred Blake is a police officer for the city of Lexington. On the night of February 16, after the shooting, he was patrolling and was dispatched to circulate the area at approximately 9:30 p.m. At the corner of Chenault and Cochran Roads, ten or fifteen minutes after he received the call, he discovered two white hats and two masks in the middle of the road. The point where the articles were found is approximately six blocks from the scene of the offense.

Carol Ann Taylor, 26 years of age, is a resident of 501 E. North Aspendale Avenue, Lexington. She is a stepsister of the appellant, Leon Bush. She testified that on the day of February 16 she was at home with her children in company with her brother, Leon Bush, and his girlfriend, Shirley Robinson; that she had been there all day; that sometime in the evening Shirley and Leon were in the kitchen and that they had an argument and Leon had Shirley make him a mask. This occurred around 5:30 p.m. One of the masks which had been found by Officer Fred Blake was exhibited to her and she positively identified it by shoe polish on it as the mask made by Shirley. She testified that in the process of getting the mask made, Leon made the statement that he needed the mask because "they were going to make some money" and said this woman, Mrs. Faulkner, "keeps money all the time." She testified that Bronston and Smith came by the house about 7:30 p.m. and they all left together in Smith's car, which was a burgundy convertible, Oldsmobile or Pontiac. 'She testified that Leon returned about 10:30 p.m. and knocked on the front door. She did not open the front door, so he came around back and said, "this is me." She then opened the back door. He was so nervous and he heaved. He then sat down and directed her to turn on the television. When the news was broadcast concerning Mrs. Faulkner's being shot, he said, "Well, I ought to have killed her." She testified that she did not see any of the others at that time, but on the following day, James Bronston came by the house and said, "They have picked up Harry." To Bronston's statement Bush responded, "Well, Harry didn't do the shooting, I done the shooting." She testified that Leon had a gun after he came back and that she saw the gun.

Shirley Robinson, 33 years of age, is a resident of 501 E. North Aspendale. She

testified she made the mask that was introduced in evidence for Leon Bush and that at the time he advised her that he was going out on a job. She testified that he left between 6:30 p.m. and 7:00 and that she was not at home when he returned; that he had already arrived when she came in, which was approximately 11:00; that she was present in the room and listened to the news with Leon and when asked, "What, if any, comment did Leon make while the news was on," she replied, "I think that he admitted to it to me." She further testified that she believed Leon was wearing a white hat when he left.

*Bush v. Commonwealth*, 457 S.W.2d 495, 496–97 (1970).

At trial defendant denied being with Bush and Smith for *any* portion of the evening on February 16, 1968. Bronston and several relatives provided alibi testimony to the effect that Bronston was home all evening the night of February 16, 1968, starting at 6:00 p.m. This evidence was in direct conflict with the evidence that defendant was at the Bush home and left with Bush and Smith earlier in the evening.

## II.

Bronston's leaving the house with Bush and Smith prior to the commission of the crime raises a rational inference that he was with them when the crime was committed, but this inference standing alone may not be sufficiently strong to establish guilt beyond a reasonable doubt. That Bronston returned to Bush's house the following morning does not add much to an inference of guilt, because the conversation that morning goes as readily to an inference of innocence as guilt.

A critical element in our analysis is the false alibi testimony offered by Bronston, which asserted that Bronston was never even with Smith and Bush during the evening of the crime. The jury was justified in rejecting this alibi, based on the neutral and convincing testimony placing Bronston at Bush's home at 7:30 p.m. The jury then rationally could use concealment of the

truth by Bronston to strengthen their other inferences of guilt. *Cf. Barsky v. United States*, 339 F.2d 180 (9th Cir.1964) (although false testimony as to one material fact does not sustain the entire burden of proof, the jury is justified in inferring guilt from an improbable and highly unlikely alibi).

Defendant argues that *Speigner v. Jago*, 603 F.2d 1208 (6th Cir.1979), *cert. denied*, 444 U.S. 1076, 100 S.Ct. 1023, 62 L.Ed.2d 758 (1980), compels a conclusion here that there is insufficient evidence to support Bronston's conviction. This Court held in *Speigner* that the evidence actually linking defendant to the murder was too tenuous to support finding guilt beyond a reasonable doubt. The defendant had been stopped for a routine traffic check while riding in the car owned by a man who was later found to have been murdered prior to the time of the traffic check. There was suspicious circumstantial evidence, as here; the defendant also made certain false statements to the police at the traffic check.

The Court held that the jury's finding of guilt amounted to mere speculation, and could not sustain a conviction. *Speigner*, however, does not purport to announce any hard and fast rules on sufficiency of the evidence by which we are bound; nor could it, given the highly fact specific nature of the inquiry.

In the case at hand, Bronston denied any association at all with his co-defendants on the night of the assault. This testimony went to the core of Bronston's involvement in the crime; it was refuted conclusively. At the heart of the adversarial process is the principle that each side's account of the facts must be held up to the light and scrutinized. The very purpose of cross-examination is to accomplish this scrutiny, and to enable the jury to determine the truth. When a defendant seeks to conceal the truth concerning his very presence on the night of the crime, the jury rationally can use that fact to strengthen its other permissible inferences.

Given this singular combination of factors, we cannot say that, under the

*Jackson v. Virginia* standard, no rational trier of fact could have found proof of guilt beyond a reasonable doubt. We, therefore, affirm the judgment of the District Court.